**John G. ABBOTT, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 94–424 C.**

United States Court of Federal Claims.

Aug. 9, 2000.

Thomas A. Woodley, Washington, DC, for plaintiff. Gregory K. McGillivary, Washington, DC, of counsel.

Erin E. Powell, with whom were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Department of Justice, Washington, DC, for defendant. Joan Slous, Associate General Counsel, Immigration and Naturalization Service, of counsel.

Larry J. Adkins, Washington, DC, for amicus curiae National Treasury Employees Union. Gregory O'Duden and Barbara A. Atkin, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

Plaintiffs[1] filed their Complaint in this matter on July 1, 1994, seeking monetary damages in the form of back pay and interest for alleged violations of federal law that would entitle plaintiffs to hazardous duty pay for law enforcement activities they perform as employees of the United States Immigration and Naturalization Service, United States Border Patrol (INS). Defendant filed its Answer on October 31, 1994.

On April 3, 1995, defendant filed a motion to dismiss the complaint (D's Mot.) under Rules of the Court of Federal Claims (RCFC) 12(b)(1) and (4). Defendant argues that the complaint should be dismissed because the hazardous duty pay statute, 5 U.S.C. § 5545(d), does not mandate the hazardous duty pay plaintiffs seek. D's Mot. at 11. In defendant's view, § 5545 either barred payment or commits the decision to make payment to the discretion of the agency. Id. Following a dispute regarding the propriety of engaging in discovery, the court issued an order on August 20, 1997 granting plaintiffs' motion to compel discovery before responding to defendant's motion to dismiss. Discovery was completed on November 10, 1999.[2] On January 27, 2000, plaintiffs filed their opposition to defendant's motion to dismiss (Ps' Opp. I), as well as a statement of genuine issues and proposed findings of fact (Ps' Facts). In their opposition, plaintiffs contend that 5 U.S.C. § 5545(d) is money-mandating and therefore, if violated, requires a recovery under this court's Tucker Act jurisdiction. 28 U.S.C. § 1491(a); D's Mot. at 18; P's Opp. I at 22–23. Plaintiffs contend that 5 U.S.C. § 5545(d) was violated because the hazards to which they are exposed were not taken into account in the classification of their positions.

On February 10, 2000, defendant filed its reply to plaintiffs' opposition, as well as a supplemental motion to dismiss (D's Supp.). As the basis for its supplemental motion to dismiss, defendant contends that this court lacks jurisdiction over plaintiffs' claims because plaintiffs' claims are governed by a negotiated grievance procedure in a collective bargaining agreement between the INS and the National Border Patrol Council. D's Supp. at 2–3. Plaintiffs filed an opposition to defendant's supplemental motion to dismiss

---

1. As of July 7, 2000, there are 2546 plaintiffs in this matter.

2. On January 27, 1999, the matter was transferred to Judge Hewitt.

(Ps' Opp. II) on March 14, 2000. Plaintiffs contend in their opposition to defendant's supplemental motion that 5 U.S.C. § 7121(a)(1), the statute circumscribing the use of negotiated grievance procedures under the Civil Service Reform Act, does not preclude plaintiffs from pursuing their claim in federal court. Ps' Opp. II at 5. Defendant filed its reply to plaintiffs' opposition on March 31, 2000. Oral argument was held on April 10, 2000. Following court-ordered supplemental briefing, as well as receipt of a memorandum by the National Treasury Employees Union (NTEU) as amicus curiae in support of plaintiffs' position, the matter is now before the court for disposition on defendant's motion and supplemental motion to dismiss.

## I. Background

### A. Statement of the Case

Plaintiffs are current and former employees of the INS at the San Diego and the El Centro sectors of the United States Border Patrol in California.[3] During the time period relevant to the complaint (1988 to present), each plaintiff has been required to work in and around the Tijuana and/or New Rivers. Complaint (Compl.) ¶ 6. As a result of their work in and around these rivers, plaintiffs have been exposed to "massive coliform contamination, raw human sewage, extreme chemical and industrial pollution and other virulent biologicals and toxic chemicals." *Id.* at ¶ 7. Plaintiffs complain that such exposure is not taken into account in the classification of their positions. *Id.* at ¶ 10.

### B. Standard of Review

Defendant bases its Motion to Dismiss on Rules of the Court of Federal Claims (RCFC) 12(b)(1) and 12(b)(4). Rule 12(b)(1) provides for dismissal of a claim based on a "lack of jurisdiction over the subject matter." RCFC 12(b)(1). *See also* Fed.R.Civ.P.

12(b)(1). Whether a court possesses subject matter jurisdiction over a claim depends upon the "court's general power to adjudicate in specific areas of substantive law." *Palmer v. United States,* 168 F.3d 1310, 1313 (Fed. Cir.1999). Rule 12(b)(4) provides for dismissal based on the "failure to state a claim upon which relief can be granted." RCFC 12(b)(4). *See also* Fed.R.Civ.P. 12(b)(6). Rule 12(b)(4) addresses "the question of whether in a specific case a court is able to exercise its general power with regard to the facts peculiar to the specific claim." *Palmer,* 168 F.3d at 1313. Dismissal by this court under 12(b)(4) constitutes an adjudication on the merits of a claim. *Maniere v. United States,* 31 Fed.Cl. 410, 419 (1994).

The Supreme Court has stated that in weighing evidence in evaluating a motion to dismiss, "whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989); *LaMirage, Inc. v. United States,* 44 Fed.Cl. 192, 196 (1999). In rendering a decision on a motion to dismiss, the court must presume that undisputed factual allegations in the complaint are true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988); *LaMirage, Inc.,* 44 Fed.Cl. at 196.

The Supreme Court restated in *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), that determining whether subject matter jurisdiction exists is an "inflexible" threshold matter.[4] Accordingly, this court addresses the jurisdiction issue first.

---

**3.** For purposes of its motion to dismiss, defendant treats as admitted the facts in plaintiff's complaint. D's Mot. at 2 n. 2.

**4.** The Court of Appeals for the Federal Circuit has recently "cautioned that broad language in judicial opinions must be read in light of the issue before the court." *Nippon Steel Corp. v. United States,* 219 F.3d 1348, 1352 (Fed.Cir. 2000) (citing *Armour & Co. v. Wantock,* 323 U.S.

126, 133, 65 S.Ct. 165, 89 L.Ed. 118 (1944)). In the *Nippon* case, where "the jurisdictional issue and the merits [were] inextricably intertwined," the Court of Appeals for the Federal Circuit stated, "In this unusual situation, we do not believe that *Steel Co.* precludes us from bypassing the jurisdictional question and deciding the merits." *Nippon Steel,* 219 F.3d 1348, 1353. Here, the question of whether the Civil Service

## II. Discussion

### A. The Civil Service Reform Act Does Not Bar a Judicial Remedy in This Case

The government argues that this court lacks subject matter jurisdiction to hear this case because the Civil Service Reform Act (CSRA) bars judicial remedies for claims that are "grieveable." D's Supp. at 2. The Civil Service Reform Act states, in relevant part:

Except as provided in paragraph (2) of this subsection, any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability. Except as provided in subsections (d), (e), and (g) of this section, *the procedures [set out in the collective bargaining agreement] shall be the exclusive administrative procedures for resolving grievances which fall within its coverage.*

*See* 5 U.S.C. § 7121(a)(1) (1996) (emphasis added).[5] Article 33 of the Collective Bargaining Agreement between the INS and the National Border Patrol Council (CBA) establishes a grievance procedure. D's Supp. Ex. 1 at 50–56. The government also points out that the President of the National Border Patrol Council, T.J. Bonner, filed a grievance under this framework for the very dispute that is before this court. D's Supp. at 3.

The government further argues that *Carter v. Gibbs*, 909 F.2d 1452 (Fed.Cir.1990) supports its contention that the grievance procedure is the exclusive remedy for the plaintiffs. D's Supp. at 5. Plaintiffs point out that *Carter* was decided before the CSRA was amended, at a time when the statute stated that " *the procedures [set out in the collective bargaining agreement] shall be the exclusive procedures for resolving grievances which fall within its coverage.*' " *See Carter*, 909 F.2d at 1454 (citing and quoting 5 U.S.C. § 7121(a)(1) (emphasis added)). P's Opp. II at 5. The government argues that the exclusive remedy holding of *Carter* is still controlling law, and therefore the court does not

have subject matter jurisdiction to hear plaintiffs' case. D's Supp. at 7–8.

Plaintiffs counter that this case is governed by *Abramson v. United States*, 42 Fed.Cl. 621 (1998). Ps' Opp. II at 5. *Abramson* was decided after the CSRA was amended to insert the word "administrative" into the statute. *See Abramson*, 42 Fed.Cl. at 627. The court in *Abramson* applied basic principles of statutory interpretation to determine the effect of the amendment, looking first at the plain meaning of the text. *See id.* at 628. "Employing the plain meaning of the word 'administrative,' demonstrated above to be distinct from 'judicial,' leads to the conclusion that, by omission, the grievance procedures are not meant to preclude recourse to judicial procedures." *Id.* at 630. The court found that "the effect of the statute's amendment is clear." *Id.* at 631. By inserting the word "administrative," Congress intended to effectively reverse *Carter* by giving employees an alternate, judicial remedy for their grievances. *See id.*

Plaintiffs urge the court to follow the *Abramson* interpretation, stating that "[w]hen interpreting a statute, the court must assume that Congress did not mean to pass meaningless legislation, but rather acted with a purpose." Ps' Opp. II at 15 (citing *Coyne & Delany Co. v. Blue Cross and Blue Shield of Virginia*, 102 F.3d 712, 715 (4th Cir.1996)). Further, "[a] change in the language of the statute is construed to mean a change in the meaning of the statute as well." *Id.* (citing *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1367 (Fed.Cir. 1998)). Because the definition of "administrative" is distinct from "judicial," Congress must have intended to remove "judicial" procedures from § 7121(a)(1) by inserting the word "administrative." *See id.* at 14.

The government argues that the amendment is not as clear as *Abramson* suggests, stating that "[t]hree years after the 1994 amendment, the Federal Circuit explicitly reaffirmed its holding in *Carter v. Gibbs* in

---

Reform Act acts as a bar to this court's jurisdiction turns on a question of statutory interpretation and appears to be appropriate for disposition under RCFC 12(b)(1).

**5.** The exceptions contained in subsections (d), (e), and (g) are not at issue in this case.

*Dunklebarger v. Merit Systems Protection Bd.,* 130 F.3d 1476, 1479 (Fed.Cir.1997)." Defendant's Reply to Plaintiffs' Opposition to Defendant's Supplemental Motion to Dismiss (D's Reply) at 2.

*Dunklebarger* involved the question of whether an employee covered by a collective bargaining agreement could appeal an employment related claim to the Merit Systems Protection Board. *See Dunklebarger,* 130 F.3d at 1476. In holding that the CSRA does not permit employees to choose between the grievance procedures in the collective bargaining agreement and an appeal to the administrative board, the Federal Circuit relied on the principles set forth in *Carter. See id.* at 1479; D's Supp. at 9. The Federal Circuit stated:

> *Carter v. Gibbs* stands for the proposition that under section 7121, a collective bargaining agreement that includes particular matters within the grievance process has the effect of depriving employees of recourse to alternative remedies to which they otherwise would have access. Nothing in the *Carter* decision, or in any other decision of this court, supports the proposition that Congress intended to permit collective bargaining agreements to enlarge the rights of employees to choose among alternative remedies for disputes falling outside the specific subject matters designated in sections 7121(d), (e), and (g).

*Dunklebarger,* 130 F.3d at 1479.

The government also points to legislative history to support its contention that Congress did not intend to enlarge the rights of employees, but rather "simply to permit the parties to collective bargaining agreements to elect whether to exclude particular subject matters from the coverage of the negotiated grievance procedures." *Dunklebarger,* 130 F.3d at 1479; D's Supp. at 9–10. Senate Report 103–358 (1994) states:

> The purpose of S. 622 is to reauthorize OSC [Office of Special Counsel] for three years and to ensure that OSC functions, as intended, to protect federal employee whistleblowers from on-the-job harassment,

negative job ratings, unfavorable transfers, denial of promotions and other retaliation for their efforts to uncover waste and mismanagement in their agencies.

D's Reply, Ex. 2 at 1.[6]

The government argues that in neither the Senate nor House reports is there any mention of *Carter v. Gibbs,* let alone an explicit statement claiming to overturn it. D's Reply at 4–5. The government claims that:

> the legislative history of the 1994 amendment is totally devoid of even the slightest support for the plaintiff's contention that Congress intended to overrule *Carter v. Gibbs* and its progeny by amending 5 U.S.C. § 7121(a)(1) .... If Congress had intended to overrule *Carter v. Gibbs* it could have done so explicitly .... Congress would not intend such a fundamental change to the CSRA without any discussion in the legislative history of the 1994 amendment.

*Id.* at 5.

Plaintiffs and the NTEU argue that the plain language of the statute effectively overrules *Carter.* The NTEU argues in its amicus brief that "where statutory language is plain, only an 'extraordinary' or 'compelling' indication of contrary legislative intent can overcome the conclusion the language requires." Memorandum of the National Treasury Employees Union as Amicus Curiae in Support of Plaintiffs (NTEU Brief) at 10 (citing *Glaxo Operations U.K. Ltd. v. Quigg,* 894 F.2d 392, 396 (Fed.Cir.1990)). The NTEU argues that the only legislative history addressing Congress's intent in the portion of the amendment to the CSRA relevant here is contained in the testimony of officials of the NTEU to the Subcommittee on the Civil Service of the House Committee on Post Office and Civil Service. *Id.* That testimony urged Congress to change the CSRA in order to overturn *Carter v. Gibbs. Id.* at 10–11 (citing *To Reauthorize the Office of Special Counsel and to Make Amendments to the Whistleblower Protection Act: Hearing on H.R. 2970 before the Subcomm. On*

---

**6.** The House Report stating the purpose of the bill contains similar language. D's Reply at 4

(citing H.R.Rep. No. 103–769 (1994)).

*Civil Serv. of the Comm. on Post Office and Civil Serv.*, 103d Cong., 1st Sess. 20–23 (1993)). The NTEU argues that this hearing testimony can be accorded significance in interpreting the statute because the witness proposed a statutory revision later adopted by the legislature. NTEU Brief at 11 (citing Norman J. Singer, *Sutherland Stat. Const.*, § 48.10 (6th ed.2000)). The NTEU argues that there is no "extraordinary" or "compelling" indication of contrary legislative intent in the history. If anything, the history supports its contention that the language was meant to overrule *Carter. Id.* at 10–12.

Plaintiffs also argue that *Dunklebarger* is inapposite to this case. Plaintiffs point out that *Dunklebarger* never addressed the amendment to § 7121(a)(1) at issue here, Ps' Opp. II at 18, but rather addressed "whether a union and agency can agree, under section 7121(a)(2), to provide employees with the option of pursuing a claim through the grievance procedure or with the Merit Systems Protection Board." *Id.* (citing *Dunklebarger*, 130 F.3d at 1476–77). Further, plaintiffs argue that *Dunklebarger* involved claims before an administrative agency, not a judicial body, so the Federal Circuit was correct in following *Carter. Id.* at 19. While the Federal Circuit in *Dunklebarger* had no reason to address the 1994 amendment, the court in *Abramson* did because that case involved judicial, not administrative action. *Id.* at 20. "Rather than follow the inapposite *Dunklebarger* decision, plaintiffs respectfully submit that the court should follow the *Abramson* decision which is directly on point with the instant case." *Id.* at 21.

■ The court finds the reasoning in *Abramson* applicable as well to this case. "Statutory interpretation begins with the language of the statute," and here the language is clear. *Hemscheidt Corp. v. United States*, 72 F.3d 868, 871 (Fed.Cir.1995) ("Language unmistakably certain on its face ends our inquiry.") While earlier versions of the CSRA interpreted in *Carter* stated that the procedures set forth in the collective bargaining agreement were to be the exclusive procedures for resolving grievances, the amended version explicitly stated that those procedures would be the exclusive *adminis-*

*trative* procedures. *See* 5 U.S.C. § 7121(a)(1) (emphasis added). The *Dunklebarger* case did not raise the issue now before this court. The *Dunklebarger* decision does not mention § 7121(a)(1), and involved only the jurisdiction of an administrative body.

■ Absent guidance on the current dispute from the Federal Circuit, the court relies on basic principles of statutory interpretation. Under basic principles of statutory interpretation, undefined terms are understood to have their ordinary meaning. *See Abramson*, 42 Fed.Cl. at 629 (citing *Koyo Seiko Co., Ltd. v. United States*, 36 F.3d 1565, 1571 n. 9 (Fed.Cir.1994)). Black's Law Dictionary defines "administrative" as follows:

> Connotes of or pertains to administration, especially management, as by managing or conducting, directing, or superintending, the execution, application, or conduct of persons or things .... Particularly, having the character of executive or ministerial action .... In this sense, administrative functions or acts are distinguished from such as are judicial.

Black's Law Dictionary 42 (5th ed.1979) (quoted in *Abramson*, 42 Fed.Cl. at 629–30). This definition expressly excludes "judicial" remedies from the definition of "administrative," supporting the view that Congress intended to exclude judicial procedures from § 7121(a)(1). There is no clear contrary evidence in the legislative history, so the inquiry should end here. For the foregoing reasons, the court finds that § 7121(a)(1) does not operate as a bar to the court's subject matter jurisdiction in this case. *See Reid v. Dept. of Commerce*, 793 F.2d 277, 281 (Fed.Cir.1986); Singer, *supra*, § 46.01.

B. Plaintiff Has Stated a Claim under 5 U.S.C. § 5545(d) and Disputed Issues of Material Fact Exist

The principal jurisdictional issue argued in the government's original April 3, 1995 motion to dismiss, that the hazardous duty pay statute, 5. U.S.C. § 5545(d), was not money mandating, was conceded by the government at oral argument. Transcript of Oral Argument on April 10, 2000(Tr.) at 5. The govern-

ment now presses the argument that the INS took the virulent biological hazards into account when classifying the plaintiffs' positions. D's Supp. at 10. The government's supplemental motion to dismiss, filed on February 10, 2000 after discovery, restated that the INS took the hazards into account when classifying the plaintiffs' positions, but also addressed a further and different issue, that the hazards plaintiffs faced were not in fact "virulent biologicals" of a type that would trigger the requirement to pay a hazardous duty differential under applicable law, 5 C.F.R. § 550, Appendix A, as defined by medical experts. *Id.* at 15–16.[7] In its reply brief filed on March 31, 2000, the government also urged that summary judgment should be granted in its favor on the issue of whether the INS took the hazards into account when classifying the plaintiffs' position. D's Reply at 13. The request for summary judgment rather than dismissal was repeated in the supplemental brief filed by the government on May 17, 2000. D's Supp. II at 10. Because both parties have addressed, in connection with plaintiffs' claim under 5 U.S.C. § 5545(d), factual issues outside of the pleadings, the court considers, in addition to the government's motion to dismiss, whether the government is entitled to summary judgment. RCFC 56.

 For the plaintiffs to prevail in this case, they must have been exposed to hazards and the government must have failed to take those hazards into account in classifying their positions. The statute which governs hazardous duty pay differential, 5 U.S.C. § 5545(d), states:

The Office shall establish a schedule or schedules of pay differentials for duty involving unusual physical hardship or hazard .... However, the pay differential—

(1) does not apply to an employee in a position the classification of which takes into account the degree of physical hardship or hazard involved in the performance of the duties thereof, except in such cir-

cumstances as the Office may by regulation prescribe ....

5 U.S.C. § 5545(d) (1996).

The government argues that the INS did take into account the hazards to which plaintiffs were exposed when the positions were classified and, therefore, that plaintiffs are not entitled to hazardous duty pay. To support this contention, the government cites the deposition of Richard Loerch, the INS classifier who was responsible for classifying the plaintiffs' positions. In his deposition testimony, Mr. Loerch stated:

Categorically, I believe that was a, a known historical condition, that the river was a polluted river. Whether one actually used the term sewage, polluted, toxic or whatever is, you know, is hard to remember after this number of years, but it was a known fact that we are, we are dealing with a polluted river situation where the Border Patrol Agents operated, just as we had some very dangerous hillsides and things of that nature, and it was considered a, the common nature of the job and we accounted for it in the physical demands and work environment parts of the classification.

D's Supp. at 12–13. The government also points to classification guidelines regarding hazards in border patrol work, which include a description which states:

Other hazards that involve Border Patrol Agents include operating automobiles in high-speed chases, attempting to stop fleeing vehicles, and working in a hazardous environment, e.g., extremes of climate and unfavorable terrain.

D's Supp. at 15. The government also argues that Border Patrol Agents can exercise their knowledge to reduce risk by wearing protective gear, quoting Office of Personnel Management (OPM) classification guidance that states:

In OPM's view, a hazardous duty is taken into account in the classification of a position when the duty is a part of knowledge, skills, and abilities required of the incum-

---

7. This late appearing issue has not been fully briefed by the parties and is not, in the court's view, ripe for disposition.

bent in the position. In other words, the incumbent of the position is able to influence the hazardous duty—i.e., exercise knowledge, skill and ability to reduce the risk of the hazard.

D's Reply at 18 (citing 59 Fed.Reg. 33416 (June 29, 1994)). The government suggests that the fact that approximately two-thirds of the Border Patrol Agents working around the Tijuana and New Rivers wear some type of gloves when apprehending aliens shows that agents were able to use their knowledge to reduce risk. *Id.* at 17–18. The government urges the court to conclude that the INS took the virulent biological hazards into account when classifying the plaintiffs' positions, and therefore plaintiffs are not entitled to hazardous duty pay. D's Supp. at 19. On the basis of these arguments, the government urges that summary judgment be granted in its favor. D's Reply at 13.

Plaintiffs concede that they are not entitled to hazardous duty pay if the hazards were taken into account in the position classification, but argue that is not the case here. Ps' Opp. I at 9–10. Plaintiffs first argue that Mr. Loerch had no "scientific knowledge" regarding pollution in the rivers. *Id.* at 5. In 1991 and 1995, the INS contracted with the Public Health Service to determine the extent of hazards in the rivers. These reports, prepared after the positions were classified,

> confirmed that the Tijuana and New Rivers are heavily contaminated with fecal material. The report noted that the level of coliform in the rivers ranged from 5,000 and 20,000,000 CFU/100 ml. Swimming is unsafe at 1,000 CFU/100. The Public Health Service concluded that the unacceptably high coliform counts in the New and Tijuana Rivers, coupled with the nature of the border patrol agents' work activities present a high probability of "diarrhea causing disease and hepatitis A."

*Id.* at 3–4. Plaintiffs also point out that Mr. Loerch defined the term "unusual environmental stress" used in the position classification to mean "such things as operation of vehicles at high speeds, boarding moving trains and vessels, and being exposed to gunfire." *Id.* at 7. Plaintiffs further argue that Border Patrol Agents do not have any knowl-

edge, skill, or abilities that can be exercised that can reduce the risk of exposure to dangerous biological chemicals in the Tijuana and New Rivers. *Id.* at 32. Plaintiffs state:

> The primary job duty of the border patrol agents and criminal investigators is to apprehend undocumented aliens, wherever the aliens go. The border patrol agents and criminal investigators are law enforcement employees. Their knowledge, skill and abilities concern law enforcement skills such as knowledge of intelligence-gathering techniques and skill in interrogation. There is nothing in the border patrol or criminal investigators' position descriptions that could be even remotely considered a knowledge, skill or ability that could be used to reduce the risk of exposure to virulent biologicals found in rivers.

*Id.* at 32–33. Plaintiffs urge the court to consider these factors in support of their view that the INS did not take these hazards into account when classifying their positions. Plaintiffs' Brief on Supplemental Issues (Ps' Supp.) at 12. Therefore plaintiffs argue that they are entitled to hazardous duty pay under § 5545(d). Ps' Opp. I at 31.

The court finds this matter to be primarily a factual dispute. Because of the material facts still in dispute, the court finds that it can neither dismiss the case nor grant summary judgment in favor of the government. In evaluating a motion to dismiss, "the allegations of the complaint should be construed favorably to the pleader." *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683. The court must also presume all undisputed factual allegations in the complaint are true. *See Miree*, 433 U.S. at 27 n. 2, 97 S.Ct. 2490. This standard presents a heavy burden for the government to overcome. The court finds that the government has not carried that burden here.

Summary judgment is also not appropriate at this time. Summary judgment is only appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule of the Court of Federal Claims (RCFC) 56(c); *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1131 (Fed.Cir.1998) (quoting RCFC 56(c)). Here, the parties have presented conflicting evidence to sup-

port their respective positions as to whether or not the INS took the hazards into account when classifying plaintiffs' positions. There are clearly genuine issues of material fact in this case that are outcome determinative. Because there are such factual disputes in this case, the court finds that summary judgment is not appropriate on this record.

### III. Conclusion

For the foregoing reasons, defendant's motion to dismiss or, in the alternative, for summary judgment is DENIED.

The parties shall file a joint status report on or before September 7, 2000, proposing a schedule for resolution of the outstanding issues in this case.

IT IS SO ORDERED.