**Donald O'CONNOR, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 00–343C.

United States Court of Federal Claims.

Aug. 24, 2001.

Steven R. Hickman, Tulsa, OK, for plaintiffs.

Kevin W. McArdle, Washington, DC, with whom was Acting Assistant Attorney General Stuart E. Schiffer, for defendant.

## OPINION

MILLER, Judge.

This case is before the court after argument on defendant's motion to dismiss in part, or in the alternative, motion for partial summary judgment.[1] The issues to be decided are 1) whether the terms of certain federal employees' collective bargaining agreement foreclose them from pursuing their overtime claims in court, and 2) whether a settlement agreement between the Government and the union representing certain of these employees constitutes an accord and satisfaction of their overtime claims, such that they cannot pursue the claims in court.

---

1. Although the decision is binding on named plaintiffs only, defendant takes the position that most or all of the remaining plaintiffs will come within an order granting its motion.

## FACTS

The following facts are not disputed. The American Federation of Government Employees ("AFGE"), Local 2433, is the exclusive bargaining unit representative of 261 plaintiffs who are employed in various offices of the Defense Contract Management District of the West ("DCMDW") in California,[2] including DCMDW headquarters, Defense Contract Management ("DCM") Seal Beach, DCM Santa Ana–Boeing Anaheim. In October 1998 DCMDW and the DCMDW Council of AFGE Locals representing DCMDW employees, including AFGE Local 2433, executed a collective bargaining agreement (the "CBA"). The terms of the CBA apply to, and are binding upon, all DCMDW/AFGE bargaining unit employees, including the 261 plaintiffs who are bargaining unit members of AFGE Local 2433.

Article 21 of the CBA, "OVERTIME ASSIGNMENTS," provides that "[p]ayment for overtime worked or granting compensatory time off, in lieu thereof, shall be in accordance with applicable laws and Government-wide regulations." Article 36 of the CBA sets forth grievance procedures. Section 3.A broadly defines "Employee(s) Grievance:"

> A grievance by a bargaining unit employee(s) is a request for personal relief in any matter of concern or dissatisfaction to the employee or group of employees concerning the interpretation, application and/or violation of this Agreement or the supplement under which the employee(s) is covered, or the interpretation or application of any law, rule or regulation with respect to personnel policies, practices and any other matters affecting conditions of employment.

Specific matters that the parties agreed to exclude from the scope of the grievance procedures are listed in Section 4 of Article 36, "MATTERS EXCLUDED." Employee overtime claims based upon alleged violations of the Fair Labor Standards Act, 29 U.S.C. § 207 (1994 & Supp. V 1999) (the "FLSA"), are not excluded from Article 36.[3]

Section 8 of Article 36 establishes a four-step grievance procedure. It states that the grievance procedure "shall be adhered to in the case of a grievance(s) filed by an employee, in behalf of an employee, or by the Union." Section 8.B of Article 36 provides that if either party is not satisfied with the decision on the grievance, it may request that the grievance be advanced to arbitration in accordance with Article 37 of the CBA. Section 6 of Article 36, "EXCLUSIVE PROCEDURE," provides: "This is the exclusive procedure available to bargaining unit employee(s) for the resolution of grievances."

From 1997 through early 1999, before DCMC was separated from DLA and renamed DCMA, *see supra* note 2, substantively identical "Union Grievances" were filed against DLA by eleven AFGE locals, including AFGE Local 2433. In each "Union Grievance," including the grievance filed by AFGE Local 2433, the unions alleged that DLA had failed to pay overtime to all bargaining unit members occupying positions at the GS–9 and above grade levels in violation of the FLSA. In correspondence relating to its grievance, AFGE Local 2433 reiterated that its grievance covered "*all* unit employ-

---

**2.** The Defense Contract Management Agency ("DCMA") and the Defense Logistics Agency ("DLA") are components of the Department of Defense ("DOD"). The DCMA was formerly the Defense Contract Management Command ("DCMC") and was a major subordinate command of DLA. In March 2000 DCMC was separated from DLA, established as an independent component of the DOD, and renamed the DCMA. The primary function of the DCMA (and the former DCMC) is the supervision and administration of contracts for the delivery of goods and services to the military. DCMA, like the former DCMC, is organized into three districts: West, East, and International. DCMDW consists of various contract administration offices and contractor plant offices located in 25 western states.

**3.** Section 5 of Article 36, "APPEAL OR GRIEVANCE OPTION," provides, in part:

> An employee alleging discrimination or affected by a removal or reduction in grade based on unacceptable performance, or an adverse action, may at his/her option raise the matter under the appropriate statutory appellate procedure or under the provisions of this Article, but not both.

Article 34 of the CBA, section 1.B, defines "adverse action" as "a removal, a suspension for more than 14 calendar days, or a reduction in grade and/or pay taken for cause."

ees at or above the GS–9 grade level." Def.'s Proposed Findings of Uncontroverted Fact, ¶ 18, filed Mar. 23, 2001. The 127 individuals named in that correspondence are also plaintiffs in this case.

In July 1999 DLA and eleven AFGE locals, including AFGE Local 2433, engaged in negotiations in an effort to reach a settlement of the Union Grievance. On July 14, 1999, the parties executed a global settlement agreement (the "Settlement Agreement") resolving the eleven Union Grievances. The settlement agreement was signed by the president of AFGE Local 2433. In ¶ 4 and appendices A, B, and C, the parties identified the specific position series that were at issue in the eleven grievances at the GS–9 grade level and above. The parties agreed that the positions identified in Appendix A would remain FLSA exempt, that the positions identified in Appendix B would be changed to FLSA non-exempt, and that the FLSA status of the positions identified in Appendix C remained in dispute. The parties further agreed to engage in negotiations in an effort to resolve the dispute and to advance the matter to arbitration if negotiations were unsuccessful.[4]

As part of the Settlement Agreement, DLA agreed to pay AFGE $5,285,000.00. DLA also agreed to make an additional $200.00 payment to each employee in the eleven union locals who occupied one of the Appendix C positions, and the parties further agreed:

> In exchange for this payment, no backpay, interest or liquidated damages will accrue for employees who occupy the positions identified in Appendix C for FLSA claims for the time period between the date the agreement is signed and nine months thereafter—i.e., up to April 14, 2000.

DLA subsequently paid $200.00 to all employees represented by the eleven union locals who occupy the Appendix C positions, including 81 plaintiffs in this action.

Finally, the eleven AFGE locals agreed that, except as provided in the agreement with respect to the disputed Appendix C positions, they would not "arbitrate the matters asserted in the FLSA grievances for the time periods covered by those grievances, nor will they pursue to arbitration individual employee FLSA claims other than as provided in this Agreement, including the FLSA status of positions in Appendices A and B."

On July 20, 2000, plaintiffs filed their complaint. Plaintiffs began filing written consent to this suit pursuant to 29 U.S.C. § 216(b) on November 29, 2000. Plaintiffs seek compensation pursuant to the FLSA for overtime allegedly worked from September 28, 1996, to the present, plus liquidated damages, interest, attorneys' fees, and costs.

On May 4, 2001, agency counsel for DCMDW filed a motion to dismiss the unions' request for arbitration because "the grievants have elected to elevate their grievances to the federal courts and to pursue remedy therein," and the "grievants" are not entitled to pursue claims in both litigation and arbitration.[5] DCMDW Motion To Dismiss, filed in *American Fed. of Govt. Employees, Local 2128 v. Defense Contract Mgmt. Dist. West,* FMCS 011205–02991–3 (May 4, 2001). DCMDW further argued the converse of what defendant argues in the instant case, *i.e.,* that the issues presented by plaintiffs "must be decided by the Court of Federal Claims." *Id.* at 7. The predicate of defendant's motion is lack of jurisdiction based on the binding effect of an agreement that restricts plaintiffs exclusively to arbitration. In order to prevent plaintiffs from being "whipsawed" out of a venue for its claims, *see National Steel & Shipbuilding Co. v. United States,* 8 Cl.Ct. 274, 275 (1985), this court requested that DCMDW file an amended motion with the arbitrator requesting only a stay until this court issues its decision. Defendant has advised that

---

4. The eleven union locals that executed the Settlement Agreement, including AFGE Local 2433, are currently attempting to arbitrate the FLSA status of the Appendix C positions.

5. "A review of the jurisdictional documents for the '2001 request for arbitration' and the federal complaints demonstrate [sic] that the grievants in this arbitration are included [primarily] within the body of plaintiffs in the ... *O'Connor* case." Def.'s Mot. To Dismiss at 9.

DCMDW did so.[6]

## DISCUSSION

### 1. Subject matter jurisdiction

The burden of proving that the Court of Federal Claims has subject matter jurisdiction over a claim rests with the party seeking to invoke its jurisdiction. *See McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). At the pleading stage, general factual allegations may suffice to meet this burden, for on a motion to dismiss the court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. National Wildlife Fed.*, 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). However, because proper jurisdiction is not merely a pleading requirement, "but rather an indispensable part of the plaintiff's case, each element [of subject matter jurisdiction] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citing *National Wildlife Fed.*, 497 U.S. at 883–89, 110 S.Ct. 3177; *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 114–15 n. 31, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin*, 422 U.S. 490, 527 n. 6, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (Brennan, J., dissenting)). Therefore, as the party invoking federal jurisdiction in this action, plaintiffs bear the burden of pleading the facts upon which the court's jurisdiction depends. *See McNutt*, 298 U.S. at 189, 56 S.Ct. 780.

Under the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994 & Supp. V 1999), the court is authorized to

render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

This jurisdiction extends only to claims for money damages and must be strictly construed. *See United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Plaintiffs invoke jurisdiction under the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201–219 (1994 & Supp. V 1999) (the "FLSA"). Under the FLSA, covered federal employees may sue for unpaid compensation in federal courts. *Id.* § 216(b). The parties do not dispute that plaintiffs are covered employees. Rather, defendant seeks dismissal on grounds that the Civil Service Reform Act of 1978, 5 U.S.C. §§ 7101–7135 (1994 & Supp. V 1999) (the "CSRA"), which governs federal employees represented by a union, limits plaintiffs to the grievance procedure negotiated by plaintiffs' union. Plaintiffs respond that an amendment to the CSRA's statutory language conferred federal courts with jurisdiction over plaintiffs' claim.

Until amended in 1994, the CSRA, 5 U.S.C. § 7121(a) (1988), provided:

(1) Except as provided in paragraph (2) of this subsection, any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability. Except as provided in subsections (d) and (e) of this section [allowing appeal to the Merit Systems Protection Board on certain matters], the procedures shall be the exclusive procedures for resolving grievances which fall within its coverage.

(2) Any collective bargaining agreement may exclude any matter from the application of the grievance procedures which are provided for in the agreement.

Courts interpreting this language held that, if a federal employee was covered by a collective bargaining agreement's grievance provisions that included, or at least did not expressly exclude, disputes addressed in other statutes, the CSRA preempted any access to

---

**6.** On June 29, 2001, DCMDW filed with the arbitrator its Agency Motion for Leave To Withdraw its May 4, 2001 Motion and To Substitute the

Attached Motion To Stay Or, in the Alternative, Motion for Summary Denial of Grievance.

federal courts granted by another statute. *See, e.g., Karahalios v. National Fed'n of Fed. Employees, Local 1263,* 489 U.S. 527, 536, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989); *Carter v. Gibbs,* 909 F.2d 1452, 1456 (Fed. Cir.1990); *Hickman v. United States,* 43 Fed.Cl. 424, 441 (1999). This preemption extended to overtime pay disputes governed by the FLSA. *Carter,* 909 F.2d at 1456.

In 1994 Congress amended section 7121(a)(1) to read: "Except as provided in subsections (d), (e) and (g) of this section, the procedures shall be the exclusive administrative procedures for resolving grievances which fall within its coverage." 5 U.S.C. § 7121(a). The remainder of section 7121(a) remains the same. Plaintiffs do not dispute that their overtime claim under the FLSA is the type of grievance which the CSRA requires be addressed by their CBA. *See* 5 U.S.C. § 7301(a)(9); *Carter,* 909 F.2d at 1454 (holding that claim for overtime under FLSA is grievance subject to CSRA's mandatory grievance procedures). Nor do plaintiffs dispute that the CBA at issue does not exclude overtime claims from its grievance procedures. Basing their argument on text, plaintiffs submit that because of the addition of the word "administrative" to delimit "procedures," a collective bargaining agreement's grievance procedures are now exclusive only as to the choice of administrative remedies. Thus, plaintiffs maintain that the CSRA no longer precludes federal employees from bringing various claims in federal court.

█ The court's interpretation of section 7121(a) is guided by well-known canons of statutory construction, which begin with an examination of the statutory language itself. *Toibb v. Radloff,* 501 U.S. 157, 162, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991); *Music Square Church v. United States,* 218 F.3d 1367, 1370 (Fed.Cir.2000). Absent clear and strong congressional intent to the contrary, if a statute has a plain meaning, that plain meaning governs. *Aaron v. SEC,* 446 U.S. 680, 695, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). Statutory text, however, is not read in the abstract. Instead, the plain meaning of statutory language more properly is understood within the context of the statutory scheme itself. *Massachusetts v. Morash,* 490

U.S. 107, 115, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989); *Kelly v. Robinson,* 479 U.S. 36, 44, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986); *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955). "[S]tatutory interpretation is a 'holistic endeavor' that requires consideration of a statutory scheme in its entirety." *Vectra Fitness, Inc. v. TNWK Corp.,* 162 F.3d 1379, 1383 (Fed.Cir. 1998) (quoting *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)). A court should not read a provision "more broadly than its language and the statutory scheme reasonably permit." *Aaron,* 446 U.S. at 685, 100 S.Ct. 1945.

█ A strong preference has been articulated for courts to interpret statutory language so as to preserve, rather than destroy, the statutory scheme. *United States v. Fausto,* 484 U.S. 439, 452–53, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988); *Menasche,* 348 U.S. at 539, 75 S.Ct. 513; *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937). The literal wording of a statutory provision is not controlling where such an interpretation defeats the congressional purpose embodied in that scheme. *Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.,* 381 U.S. 311, 321, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965). This is especially true in the context of the federal personnel system, where the Federal Circuit has noted "the Supreme Court's admonitions to leave the architecture of the federal personnel system to Congress." *Volk v. Hobson,* 866 F.2d 1398, 1403 (Fed.Cir.1989).

█ No reported legislative history illuminates Congress' intent as to the meaning of the word "administrative" in the amendment. *Abramson v. United States,* 42 Fed.Cl. 621, 631 (1998). Moreover, "administrative" is not defined within the amended provision or within the statute's definition section. The plain meaning of the term therefore must govern. Reasoning that because the ordinary meaning of the word "administrative" differs from the word "judicial" and finding nothing in the written history of the amendment to contradict this proposition, two judges of the Court of Federal Claims have concluded that the CSRA now allows a

FLSA plaintiff to elect at his option either an administrative or a judicial remedy, the amended language merely limiting the administrative remedy to the one provided in the grievance procedures of the applicable collective bargaining agreement. *Abbott v. United States,* 47 Fed.Cl. 582, 587 (2000); *Abramson,* 42 Fed.Cl. at 621. *Abbott* and *Abramson* reasoned that because the dictionary definition of "administrative" does not encompass the term "judicial," by changing "exclusive remedy" to "exclusive administrative remedy," Congress must have intended to repeal the preemption of judicial review. *Abbott,* 47 Fed.Cl. at 587; *Abramson,* 42 Fed.Cl. at 630. This court respectfully disagrees with this conclusion.[7] This court cannot agree that obeisance to the dictionary definition of the word "administrative" to the exclusion of other considerations justifies departure from a legislative scheme grounded on the premise that collectively bargained grievance procedures are the preferred method of dispute resolution for unionized federal employees.

The CSRA is a statute which, when adopted in 1978, "comprehensively overhauled the civil service system," *Lindahl v. Office of Personnel Management,* 470 U.S. 768, 773, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985), and created an elaborate "new framework for evaluating adverse personnel actions against [federal employees]." *Id.* at 774, 105 S.Ct. 1620. The main purpose of the statute was to replace the then-existing patchwork of arrangements for administrative and judicial review of personnel action, which often led to redundant and lengthy resolutions. *Id.* at 444, 108 S.Ct. 668. Thus, the CSRA framework includes an integrated scheme of both administrative and judicial review. *Fausto,* 484 U.S. at 445, 108 S.Ct. 668.

Criticism of the judiciary's role in the process was particularly widespread. For example, the concurrent jurisdiction shared by the Court of Appeals for the Federal Circuit and the former United States Court of Claims and various appeal boards led to "wide variations" in decisions. S.Rep. No. 95–969, at 9 (1978). Employees often sought both *de novo* judicial review of claims at the district court level, as well as pursued administrative remedies that could themselves be appealed directly to federal appellate courts, a scheme deemed both "wasteful and irrational" and one that caused employees "duplication, delay, expense and despair." *Polcover v. Secretary of Treasury,* 477 F.2d 1223, 1227 (D.C.Cir.1973). When Congress enacted the CSRA in 1978, it explicitly sought to reduce the participation of the federal courts. Indeed, the final bill rejected a House proposal that would have allowed employees a choice between grievance procedures and any other available remedy. H.R. 11280, 95th Cong. § 7121 (1978); H.R. Conf. Rep. No. 95–1717, at 157 (1978). Congress' preference for use of the grievance procedure over all other remedies is evidenced in the accompanying Senate Report which explained that, under the CSRA, even non-union employees must use applicable grievance procedures. S.Rep. No. 95–969, at 109–10.

Congress provided only two across-the-board exceptions to the supremacy of grievance procedures. First, causes of action for discrimination on the bases of race, color, religion, sex, national origin, disability, marital status, or political affiliation as prohibited by 5 U.S.C. § 2302(b)(1) can be redressed by either an administrative or statutory procedure, but not both. CSRA § 7121(d). Second, matters related to actions based on unacceptable performance under sections 4303 and 7512 of the CSRA may be appealed to the Merit Systems Protection Board (the "MSPB") or continue under the negotiated grievance procedures for appeal, but not both. CSRA § 7121(e). The entire scheme embodies an "unambiguous and unmistakable preference for exclusivity of arbitration," which is a "central part" of the CSRA's comprehensive scheme. *Muniz v. United States,* 972 F.2d 1304, 1309 (Fed.Cir.1992).

---

**7.** *Abbott* is also distinguishable on the facts. The complaint filed in *Abbott* pre-dated both the 1994 CSRA amendment and the collective bargaining agreement at issue. Because collective bargaining agreements do not apply retroactively, no pre-existing collective bargaining agreement preempted judicial review of plaintiffs' claims. *See Abbott v. United States,* No. 94–424, slip op. at 3 (Fed.Cl. Oct. 4, 2000) (order denying defendant's motion for reconsideration).

Pre-amendment decisions regularly justified preemption of judicial review as necessary to preserve the integrity of the CSRA's statutory scheme. In *Fausto* the Supreme Court noted that Congress expressly classified federal employees within the CSRA scheme and favored some classifications over others within the statutory scheme. 484 U.S. at 448, 108 S.Ct. 668. While probationary employees are "disfavored," competitive service employees and veterans are "most favored." *Id.* (citing CSRA §§ 4303(e), 7501(1), 7503, 7511(a), 7513). Notably, only these latter favored employees are granted limited judicial access.[8] The Court then held that a federal employee could not seek recourse to the former United States Claims Court (now the Court of Federal Claims) for a claim under the Back Pay Act, 5 U.S.C. § 5596 (1984), reasoning that to hold otherwise would turn the statutory scheme expressly giving judicial review rights only to certain categories of employees "upside down." *Fausto*, 484 U.S. at 449, 108 S.Ct. 668. Such a result also would "seriously undermine" the primacy of administrative remedies embodied in the statute and the primacy of the United States Court of Appeals for the Federal Circuit in judicial review. *Id.* In a similar pre-amendment case addressing preemption of a claim for unfair labor practices, the Supreme Court again held that since the CSRA prefers recourse to federal courts only in specific instances, entertaining cases covered by collective bargaining procedures would "seriously undermine" Congress' intended scheme. *Karahalios*, 489 U.S. at 532, 109 S.Ct. 1282.

The Federal Circuit in *Carter*, following the approach of *Fausto* and *Karahalios*, ruled that collectively bargained-for grievance procedures preempted a claim for overtime under the FLSA. 909 F.2d at 1456. Examining the statutory scheme of the CSRA, the court noted that no where did Congress allow *de novo* judicial review of federal employment actions. It thereby concluded that "[t]he point is clear: Congress narrowly circumscribed the role of the judiciary in its carefully crafted civil service scheme." *Id.; see also Muniz*, 972 F.2d at 1309; *Carr v. United States*, 864 F.2d 144, 147 (Fed.Cir.1989) (Claims Court not the "proper authority" for determining appropriateness of federal employee's suspension and dismissal); *accord Harris v. United States*, 841 F.2d 1097, 1101 (Fed.Cir.1988) (holding CSRA provisions repeal by implication government consent to suit under Tucker Act).

The Federal Circuit has maintained this view of the limited role of the judiciary in its post-amendment decisions. Addressing whether the addition of the word "administrative" precluded appeal to the MSPB when a collective grievance procedure existed, the court noted that Congress' "unambiguous" and "unmistakable" preference for arbitration remained unchanged by the amendment. *Dunklebarger v. MSPB*, 130 F.3d 1476, 1478 (Fed.Cir.1997). The court cautioned against expanding the rights afforded by section 7121(a) in "derogation of section 7121's basic purpose—to channel more employee complaints into the negotiated grievance process." *Id.* Citing *Carter*, the court continued: "[U]nder section 7121, a collective bargaining agreement that includes a particular matter within the grievance process has the effect of depriving employees of recourse to alternative remedies to which they otherwise would have access." *Id.* at 1480. Although not directly confronted with the issue of the amendment's impact on the availability of the judiciary as an "alternative" remedy, nothing in *Dunklebarger* suggests that Congress intended to reform the judicial stance on the issue of preemption. Indeed, the Federal Circuit characterized the purpose of the amendment as making the grievance process the resource for more employee complaints.

The conclusion that a judicial remedy has not been resuscitated is consistent with the otherwise unchanged purpose and the statutory scheme of the CSRA. Despite the addition of the word "administrative," Congress did not repeal the limited judicial review remedies available to certain types of em-

---

**8.** Under the CSRA judicial access is afforded only in limited circumstances and then only at the appellate level. *See, e.g.,* section 4303(e) (allowing for appeal of actions based on unac-

ceptable performance to MSPB and then to Federal Circuit by certain preference-eligible members of excepted service).

ployees. Section 7121 still requires the same election of remedies if a plaintiff is excepted under subsections (d) or (e). As part of the 1994 amendments, Congress also added a new exception under subsection (g) that slightly expanded the scope of available remedies available to excepted employees under section (d).[9] Interpreting amended section 7121(a) to allow for a statutory remedy at the non-excepted employee's option not only would turn the established scheme—but also the new amendment—on its head: Instead of having a more favorable status in terms of judicial access, excepted employees would have a less favorable status. While any non-excepted employee at any given time would have two remedies available, an administrative (exclusively the grievance procedure if applicable) or a judicial one (or both, as plaintiffs argue), excepted employees would have access only to the judiciary at the appellate level. This result would invert the statutory favor enjoyed by nonpreference excepted service employees, the very result the *Fausto* Court sought to avoid. 484 U.S. at 450, 108 S.Ct. 668.

Finally, opening the door to judicial review would undermine the structural elements of the CSRA that were not changed by the 1994 amendments. Random categories of employees would enjoy judicially created, legally enforceable employment entitlements not subject to a unifying authority. Reinstating *de novo* judicial review of employment decisions is exactly what Congress meant to eliminate with the creation of the CSRA. Congress could not have intended to scuttle the entire purpose of the CSRA by the mere insertion of the word "administrative" in section 7121. This court is unwilling to find that Congress' silence as to the intended effect of the amendment supports a contrary conclusion. If Congress intended such a drastic change to the current scheme, it is inconceiv-

able that the legislative record would not reflect some discussion or debate of that change.

An interpretation that declines to construe the term as reinstating judicial review does not render the word "administrative" superfluous and unnecessary. *Cf. Abramson*, 42 Fed.Cl. at 630. To the contrary, it is consistent with the statutory scheme to infer that the addition of the word "administrative" served merely to emphasize that, unless an employee fell within the narrowly defined class of employees covered by the new subsection (g), the negotiated grievance procedure, rather than access to the MSPB, would be the only available remedy. If Congress intended otherwise, it is not apparent from the face of the statute. Until Congress manifests a contrary intent, the prohibition stands of judicial review of FLSA claims which are not excepted from collective bargaining grievance procedures. Any other conclusion would have the effect of construing the amendment more broadly than its language and the statutory scheme reasonably permit.

This court therefore lacks subject matter jurisdiction over plaintiffs' FLSA claim because that claim is preempted by the grievance procedure negotiated by plaintiffs' union.

2. *Accord and satisfaction under the Settlement Agreement*

 Assuming, *arguendo*, that jurisdiction is present to entertain plaintiffs' claims, defendant is nevertheless entitled to partial summary judgment on the theory that the Settlement Agreement between the Government and AFGE Local 2433 constitutes an accord and satisfaction of plaintiffs' FLSA claims. Generally, an accord and satisfaction occurs when "some performance different

---

9. CSRA section 7121(g) reads, in pertinent part:
 (1) This subsection applies with respect to a prohibited personnel practice other than a prohibited personnel practice to which subsection (d) applies.
 (2) An aggrieved employee affected by a prohibited personnel practice described in paragraph (1) may elect not more than one of the remedies described in paragraph (3) with respect thereto ....

(3) The remedies described in this paragraph are as follows: (A) an appeal to the Merit Systems Protection Board under section 7701.(B) A negotiated grievance procedure under this section. (C) Procedures for seeking corrective action under subchapters II and III of chapter 12.

from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim." *Case, Inc. v. United States*, 88 F.3d 1004, 1011 n. 7 (Fed.Cir.1996) (citing *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1581 (Fed.Cir.1993)). "An accord is a contract between two parties for the settlement of an existing claim," with a satisfaction being "the execution or performance of the settlement agreement." *Valcon II, Inc. v. United States*, 26 Cl.Ct. 393, 396 (1992); *see also Consolidated Indus. v. United States*, 195 F.3d 1341, 1344 (Fed.Cir. 1999). For the court to find an accord and satisfaction, "proper subject matter, competent parties, meeting of the minds of the parties, and consideration" must exist. *Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 58, 343 F.2d 951, 955 (1965).

 Defendant contends that the Settlement Agreement between the Government and eleven AFGE locals (including Local 2433) satisfies those four elements. First, according to defendant, the Settlement Agreement resolved the FLSA status and claims of all bargaining unit employees at the GS–9 grade level and above, which is the identical subject matter at issue in the instant case. Second, the parties were competent because the AFGE Local 2433 was authorized to file a Union Grievance on plaintiffs' behalf and to enter into a binding settlement agreement resolving the grievance. Third, ample consideration was tendered and accepted under the Settlement Agreement by the Government's payment of $5,285,000.00 to the eleven union locals representing "all backpay, interest, liquidated damages and attorneys' fees and costs for the positions identified in Appendices A, B, and C incurred in the Union Grievances up to the date that this Agreement is signed [July 14, 1999]." Further, from July 14, 1999 forward, the parties agreed that the Appendix A positions would remain FLSA exempt, the Appendix B positions would be changed to FLSA non-exempt, and the status of the Appendix C positions would be arbitrated. The Government also agreed to pay, and has paid, $200.00 to each employee of the eleven locals holding an Appendix C position to cover the arbitration period. Fi-

nally, defendant insists that these various provisions of the Settlement Agreement evidence a meeting of the minds.

The court is persuaded that the Settlement Agreement was intended to resolve the FLSA claims of all the bargaining unit employees occupying the positions at the GS–9 level or above. Not only did the Settlement Agreement, under which the Government paid a large sum of money, resolve the same subject matter as the instant case, but it was intended to resolve plaintiffs' claims. With respect to plaintiffs identified in Def.'s Proposed Findings of Uncontroverted Fact ¶ 18, filed Mar. 23, 2001, as bargaining unit employees of AFGE Local 2433 holding a GS–9 position or above, the Settlement Agreement purports to address and resolve their FLSA claims.

Plaintiffs' argument that AFGE Local 2433 was not a competent representative must fail. While it is true that in the private sector, the Supreme Court held that an employee cannot waive his statutory backpay wages via an agreement with an employer, *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 704–05, 65 S.Ct. 895, 89 L.Ed. 1296 (1945); *see also Lynn's Food Stores v. United States*, 679 F.2d 1350, 1353 (11th Cir.1982), the rationale supporting that decision does not extend to federal employees. Notably, *Brooklyn Savings* was decided 34 years before the enactment of the CSRA in 1979 governing federal employees. As discussed above, the CSRA provides that, save in limited circumstances, the union is the exclusive and binding representative for all federal employees, even those not belonging to the union. 5 U.S.C. § 7121(a)(2)(c)(iii). Nothing in the 1994 amendments changed that provision. It may be noted that neither *Brooklyn* nor *Lynn's Food Stores* addressed the issue of the representativeness of a union, but involved individual releases signed by an employee and an employer. Given the unequal bargaining power between employer and employee in such situations, the releases were found to be against public policy. *Brooklyn*, 324 U.S. at 713–14, 65 S.Ct. 895. In contrast, the advantage of a union is the equalization of this bargaining power.

Not to be ignored is the fact that the terms of the Settlement Agreement itself confirm the parties' mutual intention to satisfy fully plaintiffs' claims. "The intent of the parties controls in determining if there was a meeting of the minds." *Safeco Credit v. United States,* 44 Fed.Cl. 406, 419 (1999). In order for the court to determine the parties' intent, the Settlement Agreement "must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions." *Victory Carriers, Inc. v. United States,* 199 Ct.Cl. 410, 421, 467 F.2d 1334, 1342 (1972).

In the instant case, this intent is evidenced by the calculations involved in arriving at the amount of $5,285,000.00 that the Government agreed to pay. As set forth in the relevant part of ¶ 3:

> The figure $5,285,000 was calculated by adding $225,000 in attorneys' fees[10] and costs to $5,060,000. The figure $5,060,000 was divided by 3,225, which was the estimated number of bargaining unit employees in the eleven participating locals, though the parties recognize that the lump sum figure of $5,060,000 is to be distributed solely at the discretion of the eleven participating locals among employees of those locals who have chosen to participate in the FLSA grievances.

The union's retention of the right to distribute the funds to participating bargaining unit employees does not detract from the conclusion that, because the parties computed the amount of the settlement based on the total number of bargaining unit employees occupying the disputed positions, the parties intended for the Settlement Agreement fully to satisfy plaintiffs' claim. It would be illogical for plaintiffs to negotiate a figure predicated on the total number of employees and yet not expect all employees to be covered by the Settlement Agreement.

Because the parties have mutually agreed to terms for the settlement of plaintiffs' backpay dispute, plaintiffs are precluded from now asserting a statutory claim.

---

**10.** In ¶ 7 of the Settlement Agreement, the parties agreed:

> The $5,285,000 payment represents all backpay, interest, liquidated damages and attor-

**CONCLUSION**

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Defendant's motion to dismiss is granted, and the Clerk of the Court shall dismiss the amended complaint as to the plaintiffs therein listed without prejudice for lack of subject matter jurisdiction.

2. By September 28, 2001, the parties shall file a Joint Status Report advising of the steps that must be taken to enter a final judgment in this case.