**Sharol ADDISON–TAYLOR,**
**et al., Plaintiffs,**

v.

**THE UNITED STATES, Defendant.**

**No. 99–889C.**

United States Court of Federal Claims.

Nov. 7, 2001.

Gregory K. McGillivary, Washington, D.C., argued for plaintiffs. With whom on the briefs was Molly Elkin, Washington, D.C., of counsel.

Kevin W. McArdle, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, argued for defendant. With whom on the briefs were Todd M. Hughes, Assistant Director, David M. Cohen, Director, Stuart E. Schiffer, Deputy Assistant Attorney General. Judith Robbins, Defense Logistics Agency, of counsel.

## OPINION

BRUGGINK, Judge.

This is an action brought by present and former employees of the Defense Logistics Agency ("DLA") for the alleged wrongful denial of overtime pay pursuant to the Fair Labor Standards Act, 29 U.S.C. § 207 (1994). Pending is defendant's motion to dismiss for lack of subject matter jurisdiction, or in the alternative, defendant's motion for summary judgment. The matter has been extensively briefed and orally argued. For the reasons set out below, we grant defendant's motion to dismiss.

## BACKGROUND [1]

Plaintiffs in this case are all present or former employees of DLA, a component of the Department of Defense. Prior to July 2, 1999, plaintiffs were all employed at the Defense Industrial Supply Center ("DISC") in Philadelphia, Pennsylvania, a field activity of DLA. After that date, the DLA was reorganized and the DISC was disestablished and incorporated into the Defense Supply Center ("DSCP") which is also located in Philadelphia, Pennsylvania.

While employed at DISC, plaintiffs were all members of the American Federation of Government Employees ("AFGE"), bargaining unit Local 1698. After DISC was disestablished, Local 1698 merged into Local 62. All of the plaintiffs in this action are DLA employees who were previously in AFGE Local 1698 but are now in AFGE Local 62. Local 1698 was the exclusive bargaining unit

---

1. The background facts are drawn from the pleadings and attached documents and affidavits. The facts are not materially disputed. With respect to a motion under Rule 12(b)(1), "unlike a Rule 12(b)(6) dismissal, the court need not confine its evaluation to the face of the pleadings, but may review or accept any evidence, such as affidavits, or it may hold an evidentiary hearing." 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.30[3] (3d ed.2000) (citing Hammond v. Clayton, 83 F.3d 191, 192 (7th Cir.1996)).

representative of all DISC employees prior to its disestablishment and Local 62 became the exclusive bargaining unit representative for all DSCP employees. The DLA Council of AFGE Locals, in turn, is the exclusive collective bargaining agent of all Locals and all bargaining unit employees in those Locals.

Relevant to the pending motion is a collective bargaining agreement entered into between DLA and the DLA Council of AFGE Locals on May 14, 1997. The terms of the collective bargaining agreement apply to all DLA employees in the local AFGE bargaining units irrespective of whether they are members of the local. Thus, all of the plaintiffs in the current action are covered by the collective bargaining agreement ("CBA").

Article 2 of the CBA, Governing Laws and Regulations, provides, among other things, that the parties to the agreement "are and shall be governed by all applicable laws of the United States ...," and that "[t]he Agency shall effectively enforce all provisions of the Civil Service Reform Act of 1978 ...." In addition, Article 21. Overtime Assignments, provides that "[p]ayment for overtime worked or granting compensatory time off, in lieu thereof, shall be in accordance with applicable laws and Government-wide regulations."

The grievance procedures are set out in Article 36.[2] An employee "grievance" is defined as follows:

A grievance by a bargaining unit employee(s) is a request for personal relief in any matter of concern or dissatisfaction to the employee or group of employees concerning the interpretation, application and/or violation of this Agreement or the supplement under which the employee(s) is covered, or the interpretation or application of any law, rule or regulation with respect to personnel policies, practices and any other matters affecting conditions of employment.

The parties do not dispute that this language covers Fair Labor Standards Act ("FLSA") claims. The agreement later states that "[a] Union Grievance deals with a broad and general subject rather than an individual case except by mutual agreement of the Parties...." Pls.' App. at 50. Article 36 § 6 provides that the grievance procedure "is the exclusive procedure available to bargaining unit employees for the resolution of grievances."

Although the grievance procedures are exclusive for all covered grievances, under Article 36, the two sides agreed to exclude certain matters. Violations of the FLSA are not, however, excluded. Article 36 also allows either party to the grievance, if not satisfied with the decision, to submit the matter to arbitration.

During 1997 and 1998, eleven Locals filed substantively identical "Union Grievances" against DLA for the wrongful denial of FLSA overtime pay.[3] Local 1698 filed its

---

2. Specifically, the grievance procedures contain four steps:

Step 1—The grievance shall first be taken up orally by the grievant(s) and/or the AFGE Local representative with the immediate supervisor.... A verbal decision will be given to the grievant within five (5) working days ....
Step 2—If the matter is not satisfactorily settled ... the grievant may, ... submit the complaint, in writing, to the next level of supervision ... The grievant(s) will be provided with a written answer within 10 workdays following the meeting.
Step 3—If the matter is still not resolved ... the grievance may be presented ... in writing, to the SLFA commander or the Director as appropriate. For all employee grievances the SLFA commander or Director will issue the final Agency decision in writing within 10 workdays after receipt of the formal grievance.

Step 4—For Union Grievances only, if the matter is still not resolved after receipt of the Step 3 response, the Union Grievance my be presented ... by the Local President in writing, to the District Commander .... The decision will be the final Agency decision for the purposes of the grievance procedure.

3. DLA disputed arbitrability on the grounds that the grievance was not a "union grievance." See supra note 2. The arbitrator rejected this argument. Plaintiffs now argue that settlement only bound the union and certain employees who opted to participate-not these individual plaintiffs. Defendant maintains that the grievance was not filed on behalf of some limited subgroup of bargaining unit employees as plaintiffs suggest. In any event, the distinction is only relevant to defendant's accord and satisfaction defense, which is moot due to the court's ruling on jurisdiction.

grievance on December 21, 1998. In pertinent part, it states the following:

I. Nature of Grievance

. . . .

This is a grievance regarding the wrongful failure of [DISC] ... to pay FLSA overtime compensation to bargaining unit members.... Thus, this grievance concerns the misapplication of laws and regulations affecting the pay and working conditions of AFGE Local 1698 bargaining unit members employed by DLA. In addition, the agency's failure to provide employees with the FLSA overtime is in violation of article 21, section 1 of the collective bargaining agreement.

On behalf of current and former AFGE Local 1698 members and pursuant to Article 36 of the collective bargaining agreement covering the parties, AFGE Local 1698 hereby grieves the wrongful failure of the United States Government to provide them with time and one-half overtime compensation in accordance with Section 7 of the FLSA, 29 U.S.C. § 207(a), and Title 5 of the U.S.C.

. . . .

For the past three years and before, and continuing to date, the Agency has violated and continues to violate the provisions of the FLSA and Title 5 by failing and refusing, in a willful and intentional manner, to pay the overtime pay required under law to employees at grades GS–12 and below who work in the positions occupied by AFGE Local 1698 bargaining unit members.

As all of the DLA members at the GS–09 and above grade level represented by AFGE Local 1698 are currently improperly classified as "exempt" from the FLSA, *each and every* time that these employees have worked overtime during the past three years, the Agency has failed to properly compensate them for that work . . . .

. . . .

In accordance with Article 36, Section 8, the unit employees covered by this grievance hereby designate AFGE Local 1698 to act as their representative in this matter.

II. *Relief Sought:*

AFGE Local 1698 seeks relief to the fullest extent available under the law for the Agency's wrongful failure to pay FLSA overtime pay to bargaining unit employees. In addition, for each bargaining unit member who ultimately expresses an interest in pursuing a damage award, AFGE Local 1698 seeks an award of back wages ... as defined under the FLSA. . . .

Further, in accordance with Section 16(b) of the FLSA, AFGE Local 1698 seeks an equal amount of damages in the form of liquidated damages and reimbursement of attorney fees and expenses incurred in pursuing the employees rights under the FLSA to make the Union whole again. . . .

Of course, AFGE Local 1698 also seeks to have the FLSA status of each bargaining unit member who is now classified as FLSA exempt to be changed to FLSA non-exempt so that these employees can begin receiving true FLSA overtime as required under the law.

The agency denied all of the Locals' grievances, including that of Local 1698. In the fall of 1999, the first grievance, which was substantively identical to Local 1698's, was advanced to arbitration.

While the grievance was in arbitration, the agency and representatives from the participating unions engaged in settlement negotiations. On July 14, 1999, the two sides executed a settlement agreement covering Local 1698, as well as the other locals.

Attached to the settlement agreement were three appendices that listed the positions for which overtime was due. These were the same positions at issue in the union's grievance. It was agreed that the positions listed in Appendix A would remain exempt from the FLSA and that the positions listed in Appendix B would be treated as FLSA non-exempt in the future. The positions listed in Appendix C were those for which exemption status remained in dispute. The two sides agreed to engage in negotiations using a mediator to attempt to resolve the Appendix C positions and to advance the matter to arbitration if the negotiations failed.

In addition to resolving the exemption status of the position listed in Appendices A and B and subjecting the dispute with respect to the Appendix C positions to arbitration, the settlement agreement also provided that DLA would pay AFGE $5,285,000, calculated, as follows:

> 3. The Employer agrees to pay the Union a total of $5,285,000 on or before October 10, 1999. Of this amount, $225,000 represents reimbursement of attorneys' fees and costs incurred to date by the Union in pursuing the FLSA grievances. (The figure $5,285,000 was calculated by adding $225,000 in attorneys' fees and costs to $5,060,000. The figure $5,060,000 was divided by 3,225, which was the estimated number of bargaining unit employees in the eleven participating locals, though the parties recognize that the lump sum figure of $5,060,000 is to be distributed solely at the discretion of the eleven participating locals among employees of those locals who have chosen to participate in the FLSA grievances.) ...

Settlement Agreement dated July 14, 1999 found at Def.'s App. at 86. Paragraph 7 of the agreement went on to provide:

> The $5,285,000 payment represents all backpay, interest, liquidated damages and attorneys' fees and costs for the positions identified in Appendices A, B, and C incurred in the Union grievances up to the date that this Agreement is signed. Each employee who is in one of the Union Locals and who occupies one of the positions identified in Appendix C shall receive a payment of $200,00 on or before October 10, 1999. In exchange for this payment, no backpay, interest or liquidated damages will accrue for employees who occupy the positions identified in Appendix C for FLSA claims for the time period between the date the agreement is signed and nine months thereafter—i.e., up to April 14, 2000.

Settlement Agreement dated July 14, 1999 found at Def.'s App. at 88. The amount the union received, in short, was calculated based on back pay for all bargaining unit employees

listed in Appendices A and B, including some who are plaintiffs here.

Finally, the settlement agreement provided that, other than the possible arbitration of Appendix C positions, the Union would not "arbitrate the matters asserted in the FLSA grievances for the time periods covered by those grievances nor [would] they pursue to arbitration individual employee FLSA claims other than as provided in [the] Agreement, including the FLSA status of positions in Appendices A and B." Def.'s App. at 89.

In September 1999, DLA transmitted $5,285,000 to the law firm representing the AFGE, DLA also paid $200 to each employee of the eleven union locals holding the Appendix C positions.

The negotiations to resolve the disputed Appendix C positions proved unsuccessful. As a result, that matter was taken to arbitration.

On October 12, 1999, while the dispute with respect to the Appendix C positions was in arbitration, a memorandum was sent to Local 1698 by the same law firm that represented the eleven union Locals during the earlier settlement negotiations. The memorandum stated that a lawsuit was being filed to recover FLSA overtime compensation for employees at DLA. The memorandum provided that "employees who were previously in the AFGE Local 1698 DLA bargaining unit, but who are now in AFGE Local 62, and who did not previously sign up for the Local 1698 grievance" were eligible to participate in the suit. The memorandum went on to list the forty positions to which the suit was limited. All but one of the positions were included in Appendix B or Appendix C of the settlement agreement.[4] The memo required that in order to participate in the lawsuit, the employee had to, among other things, complete a consent/retainer form.

The complaint filed in this case was the culmination of the October 12, 1999, memorandum. There are currently 416 plaintiffs, all of whom either hold or held positions identified in Appendices B or C of the settle-

---

4. Although one Appendix A position was listed, in plaintiffs' statement of genuine issues, they maintain that no employees occupying Appendix A positions were permitted to participate in the lawsuit.

ment agreement. Of the current plaintiffs, 110 received a $200 payment pursuant to the settlement agreement.

## DISCUSSION

Plaintiffs' claims are at the confluence of a number of statutes granting substantive and procedural rights to federal employees. The source of plaintiffs' substantive right is the overtime pay provision of the FLSA. In relevant part, it provides:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1) (1994). The FLSA also provides that employees who serve in "a bona fide executive, administrative, or professional capacity, ... or in the capacity of outside salesman ...," are exempt from the statute's overtime provisions. 29 U.S.C. § 213(a)(1). Federal employees who believe they have been wrongfully characterized as exempt from the FLSA's provisions may seek damages in courts with competent jurisdiction. See 29 U.S.C. § 216(b). Accordingly, plaintiffs seek compensation in this court under the Tucker Act 28 U.S.C. § 1491 (1994).

As noted earlier, plaintiffs are also covered by a collective bargaining agreement. Arti-

cle 2 of the agreement states that the parties are "governed by all applicable laws of the United States ...." and the Agency is required to "effectively enforce all provisions of the Civil Service Reform Act of 1978 ["CSRA"] ...." Def.'s App. at 8; see also *Dunklebarger v. Merit Systems Protection Board,* 130 F.3d 1476, 1478 (Fed.Cir.1997) (recognizing that federal collective bargaining agreements are subject to the CSRA). Pursuant to this article, therefore, the agreement is subject not only to the CSRA, but also, as defendant argues, the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 (1994).[5]

The CSRA defines "grievances" to include "any claimed violation, misinterpretation, or misapplication of any law ... affecting conditions of employment." 5 U.S.C. § 7103 (1994). This definition embraces violations of the FLSA overtime provisions, however, the statute also permits the parties to exclude any matters they wish from the grievance procedures. 5 U.S.C. § 7121(a)(2). Under the CSRA, the negotiated grievance procedures in a federal collective bargaining agreement are "the exclusive *administrative* procedures for resolving grievances which fall within its coverage."[6] 5 U.S.C. § 7121(a)(1) (emphasis added). In addition, section 7121 also grants an election of administrative remedies to employees affected by certain types of personnel practices. See 5 U.S.C. § 7121(d), (e), (g). A grievance based on the denial of FLSA overtime does not trigger these election of remedies provisions.

Prior to 1994, section 7121 of the CSRA provided that the negotiated grievance procedures in a collective bargaining agreement were the "exclusive procedures" for resolving disputes.[7] 5 U.S.C. § 7121(a) (1988). The

---

5. The FAA provides in pertinent part:
 A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
 9 U.S.C. § 2.

6. 5 U.S.C. § 7121(a) provides:
 (a)(1) Except as provided in paragraph (2) of this subsection, any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of

arbitrability. Except as provided in subsections (d), (e), and (g) of this section, the procedures shall be the *exclusive administrative procedures* for resolving grievances which fall within its coverage.
 (2) Any collective bargaining agreement may exclude any matter from the application of the grievance procedures which are provided for in the agreement.
 5 U.S.C. § 7121(a) (emphasis added).

7. The prior version of 5 U.S.C. § 7121(a)(a)(1) provided:
 Except as provided in paragraph (2) of this subsection, any collective bargaining agree-

word "administrative" was inserted in 1994. *See* United States Office of Special Counsel Merit Systems Protection Board: Authorization, § 9c, Pub.L. No. 103–424, 108 Stat. 4361 (codified in scattered sections of 5 U.S.C. and 12 U.S.C.). The collective bargaining agreement in this case was entered into three years after section 7121(a) was amended.

Defendant argues, relying on the text of the CSRA and the Federal Circuit's decision in *Carter v. Gibbs*, 909 F.2d 1452 (Fed.Cir. 1990), that because FLSA overtime claims were not excluded from coverage, in the CBA plaintiffs may not pursue them through any other process, including an action in court. Defendant also argues that pursuant to the Supreme Court's decision in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the union and agency can and did agree in the collective bargaining agreement to waive an individual employee's rights to pursue a judicial remedy. Alternatively, the defendant argues that the plaintiffs' claims are subject to summary judgment due to the accord and satisfaction resulting from settlement of the grievance.

Plaintiffs respond that, according to the plain language of the 1994 amendment to section 7121, they are not barred from pursuing a judicial remedy; that *Carter* is no longer good law. Plaintiffs also argue, relying on the Supreme Court's decision in *Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), that a union cannot waive the rights of covered employees to pursue a judicial remedy provided by statute. As to the affirmative defense of accord and satisfaction, plaintiffs argue that the elements are not satisfied.

The court is persuaded, for reasons set out below, that it lacks jurisdiction over these claims. Accordingly, only the motion to dismiss need be considered.

In *Carter*, the collective bargaining agreement at issue, like the one in this case, provided that its negotiated grievance procedures were the "exclusive procedures" for pursuing grievances. FLSA claims were not excluded from coverage. Despite being covered by the collective bargaining agreement, several hundred Internal Revenue Service employees brought suit to recover overtime under the FLSA. 909 F.2d at 1452. The government successfully moved to dismiss the claims in district court on the grounds that section 7121(a) of the CSRA foreclosed plaintiffs' right to pursue judicial remedies. Plaintiffs appealed, arguing that the exclusivity provision of section 7121(a) did not apply to FLSA claims. *See id.* at 1454. The Federal Circuit disagreed and affirmed the dismissal:

> [T]he CSRA requires that federal employees subject to a collective bargaining agreement negotiate with their employing department or agency whether to preserve the FLSA remedy, or instead to commend FLSA claims to the bargained grievance procedures. By accepting a position covered by the collective bargaining agreement, appellants effectively chose the procedures negotiated by the union. They cannot now assail the sufficiency of those procedures, and we decline their invitation to meddle with the civil service system.

*Id.* at 1458.

According to plaintiffs, the 1994 amendment to the CSRA overturned the *Carter* decision and, as a result, they are no longer foreclosed from pursuing a judicial remedy. Plaintiffs maintain that, under the amended version of the CSRA, the proper interpretation of their CBA is that covered employees "cannot use any other administrative procedure, such as the Agency's grievance procedure or OPM's procedures, for resolving grievances that fall within the scope of the definition of grievance." Pls' Opp. Br. at 6. They urge the court to follow the reasoning of this court in *Abramson v. United States,*

ment shall provide procedures for the settlement of grievances, including questions of arbitrability. Except as provided in subsections (d) and (e) of this section, the procedures shall be the *exclusive procedures* for resolving grievances which fall within its coverage.

(2) Any collective bargaining agreement may exclude any matter from the application of the grievance procedures which are provided for in the agreement.

5 U.S.C. § 7121(a)(1988) (emphasis added).

42 Fed.Cl. 621 (1998), and *Abbott v. United States*, 47 Fed.Cl. 582 (2000), cases rejecting the same argument defendant now raises.

Defendant counters that *Carter* has not been affected and offers an alternative interpretation of the 1994 amendment. It insists that the amended section clarifies that an employee is only entitled to choose between different *administrative* remedies if the grievance falls under subsections(d) (prohibited personnel practice under section 2302(b)(1)), (e) (unacceptable performance and conduct based adverse actions), or (g) (other prohibited personnel practice) otherwise, his or her exclusive administrative remedy is the negotiated grievance procedures under their CBA. The insertion of the word "administrative," defendant argues, therefore, does not reflect an intent on the part of Congress to overrule *Carter*. This position has been adopted twice by this court since the original briefing in the present case, first in *O'Connor v. United States*, 50 Fed.Cl. 285 (2001) and then in *Mudge v. United States*, 50 Fed.Cl. 500 (2001).

 We follow the basic rules of statutory construction and interpretation in examining the 1994 amendment to section 7121. First, the starting point of interpretation is the language of the statute itself. *Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 330, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978). Only if there is genuine uncertainty in the meaning does the court have a duty to apply additional rules of interpretation. *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917).

The addition of the word "administrative" begins the controversy. Black's Law Dictionary defines "administrative" as:

> Connotes of or pertains to administration, especially management, as by managing or conducting, directing, or superintending, the execution, application, or conduct of

persons or things . . . . Particularly, having the character of executive or ministerial action . . . . In this sense, administrative functions or acts are distinguished from such as are judicial.

Black's Law Dictionary 29 (6th ed.1991). Given this definition, "administrative" could be interpreted to have the effect plaintiffs propose: to limit employees' administrative remedy to the negotiated grievance procedures, while putting no restriction on their judicial remedies. *Abramson* and *Abbott* gave the amendment this meaning. In *Abramson*, the court stated that "[e]mploying the plain meaning of the word 'administrative,' demonstrated above to be distinct from 'judicial,' leads to the conclusion that, by omission, the grievance procedures are not meant to preclude recourse to judicial procedures." 42 Fed.Cl. at 630. Similarly in *Abbott*, the court stated that "this definition expressly excludes 'judicial' remedies from the definition of 'administrative,' supporting the view that Congress intended to exclude judicial procedures from § 7121." 47 Fed.Cl. at 587.

Defendant's alternative interpretation also has support. Insertion of the word "administrative" may be read to clarify the exclusivity of the grievance procedure as against different administrative procedures that might otherwise be available. The emphasis thus is on the word "exclusive" and not on the word "administrative." This is, in effect, the interpretation used by the *Mudge* court.[8] The court stated that the addition of "administrative" should be read "not as a substantive enlargement of [the 1994 amendment], but rather as a clarification of it." *Mudge*, 50 Fed.Cl. at 505.

The court in *O'Connor* also chose not to follow *Abramson* and *Abbott*, although for somewhat different reasons. It stated that it could not "agree that obeisance to the dictio-

---

8. *Mudge* acknowledges that the word "administrative" cannot simply be overlooked but must be given meaning. Judge Weiss holds that reading "administrative" to allow a judicial remedy renders the second paragraph of the statute inoperative. Section 7121(a)(2) provides, in part, that "[a]ny collective bargaining agreement may exclude any matter from the application of the grievance procedures which are provided for in the agreement." *Mudge* maintains that this provision may be utilized "where a union seeks to preserve a judicial remedy for the resolution of specific types of claims . . ." *Mudge*, 50 Fed.Cl. at 504. Judge Weiss finds that this "ability to bargain for the preservation of judicial remedies would be meaningless if . . . such remedies remain accessible" irrespective of resort to section 7121(a)(2). *Id.*

nary definition of the word 'administrative' to the exclusion of other considerations justifies departure from a legislative scheme grounded on the premise that collectively bargained grievance procedures are the preferred method of dispute resolution for unionized federal employees." *O'Connor*, 50 Fed.Cl. at 290. The *O'Connor* court did not attach an alternative purpose to insertion of the word "administrative," but rested its result instead on the over-arching policy concerns reflected originally in *Carter*.

█ The split in opinions suggests that there is no plain meaning of the phrase. We are thus entitled to consider the apparent intent and purpose of the statute. *United States v. Harvey*, 814 F.2d 905 (4th Cir.1987), *judgment aff'd*, 491 U.S. 617, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989); *see also* SUTHERLAND STATUTORY CONSTRUCTION § 45:05 (Norman Singer ed.) (6th ed.2000). In this effort we may consider the context of the provision and, if available, its legislative history.

There are two types of legislative history, direct history (generated with the bill) and indirect history (generated outside of the bill's history but relevant to the interpretation of the language). Unfortunately, concerning the statute at bar, Congress generated no legislative history that is directly on point. H.R. 2970 is the bill that amended section 7121. H.R. 2970 was passed by the House on October 3, 1994, then on October 7, 1994, the word "administrative" was added as a floor amendment in the Senate. *See* 140 Cong. Rec. 27,361 and 28,823–28,825 (1994). The Senate's amendment to H.R. 2970 was sent, with a message from the Senate, back to the House where it was adopted. *See* 140 Cong. Rec. 29,350. There was no discussion or explanation by either house. The only insight to the meaning that Congress intended for the amendment to H.R. 2970 is given by its title, "Technical and Conforming Amendment."

Plaintiffs urge the court to go farther a field in determining legislative intent. They direct the court to the history of H.R. 2970 prior to the relevant floor amendment. H.R. 2970 was first introduced in 1993 (although not passed until the following year). During a hearing on H.R. 2970 in 1993, a representative of the National Treasury Employees Union urged Congress to change the law to overturn *Carter v. Gibbs:*

> One final suggestion that I might make, if the grievance procedure is made exclusive, we believe the law should be clarified that it would only be the exclusive administrative remedy but would not foreclose judicial remedies contained in other statutes, and I particularly point to the Federal Circuit's decision in *Carter versus Gibbs* .... Congress intended the grievance procedure to be a strong avenue but courts have misinterpreted that intent to take away the individual rights of individual employees under, for example, the overtime pay statutes and the Privacy Act to go to court.

*To Reauthorize the Office of Special Counsel and to Make Amendments to the Whistleblower Protection Act: Hearing on H.R. 2970 Before the SubComm. on the Civil Service of the House Comm. on Post Office and Civil Serv.*, 103d Cong. 21 (1993) (statement of Tim Hannapel, assistant counsel in the Office of General Counsel, National Treasury Employee's Union). Two observations have to be made about this statement. First, it was made, not by a sponsor, but by a representative of an interest group during a discussion of amendments to the Whistleblower Protection Act. Second, it was made before the word "administrative" was added to the amendment. In other words, Mr. Hannapel was urging legislation not then before the committee. We thus view this statement as showing no more than the wishes of the National Treasury Employee's Union.

Additional indirect legislative history comes from earlier-published House committee reports that discuss another piece of proposed legislation—one which was never enacted—H.R. 2721. That bill was, however, in substance, identical to the final version of H.R. 2970, i.e., it included the addition of the word "administrative" to section 7121. The Committee on Education and Labor reported that the proposed bill to amend 5 U.S.C. § 7121:

> clarifies Congress' original intent that the grievance procedure would be an exclusive administrative procedure for matters that

it covers. The grievance procedure was never intended to deprive employees of access to the courts. This clarification is necessary to correct an erroneous decision of the U.S. Court of Appeals for the Federal Circuit. *Carter v. Gibbs,* 909 F.2d 1452 (Fed.Cir.1990), cert. denied sub nom. *Carter v. Goldberg,* 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990), which denied employees the right to judicial review of claims under the Fair Labor Standards Act.

*Federal Employee Fairness Act of 1994,* H.R. Rep. 103–599, pt. 1, at 56 (1994). The Committee on Post Office and Civil service also reported that the purpose of the amendment was to "clarify that section 7121 is not intended to limit judicial remedies otherwise provided by law." *Federal Employees Fairness Act of 1994,* H.R. Rep. 103–599, pt. 2, at 75 (1994).

In fairness to plaintiffs, it has to be admitted that the sponsors of this proposal clearly set their sights on overturning *Carter,* and intended to do so by adding the word "administrative" to section 7121(a)(1). It is also indisputable, however, that the legislation did not pass.

▪ The court interprets legislation on the assumption that the legislature was aware of existing judicial decisions, *Motorola, Inc. v. United States,* 729 F.2d 765, 770 (1984) (citing *Blake v. McKim* 103 U.S. 336, 339, 26 L.Ed. 563 (1881)). Indeed this assumption underlies plaintiff's legislative history argument. This canon of statutory construction does not give a decisive answer to the issue at bar, however. We can safely assume that Congress was aware of the *Carter v. Gibbs* decision but, because of the absence of direct legislative history, we cannot assume that

Congress understood that the addition of the word "administrative" would overturn that decision. The word and its placement in the statute are not unambiguous and, by themselves, would not have alerted Congress to the possible interpretation given to it by plaintiff. The addition of the word "administrative" came as a last minute Senate amendment to the bill without debate or discussion. The total absence of direct legislative history for the year in which the amendment did pass, its characterization as "Technical and Conforming," and its arrival as a floor amendment all caution against reading into it the drastic changes plaintiffs propose to the law as announced in *Carter v. Gibbs.*

▪ We presume that the legislature in the enactment of a statute does not intend to overthrow established principles of law unless that intention is made clear.[9] The Federal Circuit made it clear that the CSRA's main purpose was to create a new framework for evaluating adverse personnel actions against federal employees and replace the assortment of administrative and judicial review of personnel action with a more particularized scheme.[10] *Carter,* 909 F.2d at 1455–56. As the court emphasized in *Muniz v. United States,* 972 F.2d 1304 (Fed.Cir.1992), "The Congressionally unambiguous and unmistakable preference for exclusivity of arbitration is a central part of the comprehensive overhaul of the civil service system provided by the CSRA." *Id.* at 1309. The plaintiff's proposed reading of "administrative" would significantly undermine this strong preference for settling disputes through collective bargaining agreements. If Congress wishes to overturn *Carter v. Gibbs,* in other words, it would require more than a one word "Technical and Conforming" amendment to make

---

**9.** Although the United States Supreme Court and the Federal Circuit have recognized legislative histories which accompanied earlier, unenacted bills, those cases are distinguishable from the circumstances at hand. *United States v. Enmons,* 410 U.S. 396, 405, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973) (noting that legislative history from the original unenacted bill was relevant to the bill enacted a year later because the original bill's history was repeatedly referred to in the congressional debates of the latter); *Huffman v. Office of Personnel Management,* 263 F.3d 1341, 1347 (2001) (considering the legislative history of a

prior bill that was pocket-vetoed by the President and then reintroduced the next year, noting that the language did not change).

**10.** The court should look to the objective to be obtained by the statute and should try to preserve the statutory scheme. *United States v. Fausto,* 484 U.S. 439, 452–53, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988); *Menasche,* 348 U.S. at 539, 75 S.Ct. 513; *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937). *See* Sutherland Statutory Construction § 45:05.

that clear. *Cf. Dunklebarger,* 130 F.3d at 1479–80 (reaffirming *Carter v. Gibbs* in the context of a CBA purporting to permit a choice between an appeal to the Merit Systems Protection Board and the negotiated grievance procedure).

## CONCLUSION

We find that the addition of the word "administrative" to section 7121 of the CSRA does not affect the continuing viability of *Carter v. Gibbs.* The amendment does not resurrect an alternative judicial remedy for FLSA claims for employees in plaintiffs' positions. Accordingly, defendant's motion to dismiss is granted. In view of our holding, it is unnecessary to address defendant's other arguments. The clerk is directed to dismiss the complaint. Each side to bear its own costs.