Sharol **ADDISON–TAYLOR,**
**et al., Plaintiffs,**

v.

The **UNITED STATES, Defendant.**

No. 99–889C.

United States Court of Federal Claims.

Dec. 28, 2004.

Gregory K. McGillivary, Washington, D.C., argued for plaintiffs. With him on the briefs was Molly Elkin, Washington, D.C., of counsel.

Sheryl L. Floyd, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, argued for defendant. With her on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Judith Robbins, Defense Logistics Agency, of counsel.

OPINION

BRUGGINK, Judge.

This is an action brought by present and former employees of the Defense Logistics Agency for the alleged wrongful denial of overtime pay pursuant to the Fair Labor Standards Act, 29 U.S.C. § 207 (2000). We initially dismissed the case in 2001 for lack of jurisdiction, holding that plaintiffs' exclusive remedy for challenging the failure to pay overtime wages was under their collective bargaining agreement. *See Addison–Taylor v. United States,* 51 Fed.Cl. 25 (2001) (*Addison–Taylor I*). Plaintiffs appealed. The decisions of the Federal Circuit in the companion cases of *Mudge v. United States,* 308 F.3d 1220 (Fed.Cir.2002), and *O'Connor v. United States,* 308 F.3d 1233 (Fed.Cir.2002), effectively reversed *Addison–Taylor I,* and the case was remanded. *Addison–Taylor v. United States,* 73 Fed.Appx. 418 (Fed.Cir. 2003).

At the time the case was initially dismissed, defendant also had pending a motion for summary judgment. Defendant contended that plaintiffs' claims were barred because their union executed an agreement in 1999 settling the claim, thereby constituting an accord and satisfaction. By order of April 26, 2004, the court directed the parties to brief the issue of accord and satisfaction in light of *O'Connor,* which also addressed similar arguments. During briefing, the parties notified the court that an additional settlement agreement affecting these parties was executed in March 2004. The matter has been briefed fully only with respect to the effect of the 1999 settlement agreement. Oral argument was held on December 13, 2004. For the reasons set out below, we agree with defendant that the claims of certain plaintiffs are completely barred by the 1999 agreement and that the claims of remaining plaintiffs are partially barred. We also conclude, however, that the remaining claims must be addressed in light of the more recent settlement agreement.

BACKGROUND

Plaintiffs in this case are present or former employees of the Defense Logistics Agency ("DLA"), a component of the Department of Defense. Prior to July 2, 1999, plaintiffs were all employed at the Defense Industrial Supply Center ("DISC") in Philadelphia, Pennsylvania, a field activity of DLA. After that date, the DISC was disestablished and incorporated into the Defense Supply Center ("DSCP"), which is also located in Philadelphia.

While employed at DISC, plaintiffs were all members of the bargaining unit represented by American Federation of Government Employees ("AFGE") Local 1698. After DISC was disestablished, AFGE Local 1698 merged into AFGE Local 62, and Local 62, in turn, became the exclusive bargaining unit representative for all DSCP employees. All of the plaintiffs in this action are DLA employees who were previously represented by AFGE Local 1698 but are now represented by the AFGE Local 62. The DLA Council of AFGE Locals was the exclusive collective bargaining agent for all locals and all bargaining unit employees in those locals, including Local 1698 and Local 62.

Relevant to the pending motion is a collective bargaining agreement entered into between DLA and the DLA Council of AFGE Locals on May 14, 1997. The terms of the collective bargaining agreement apply to all DLA employees in the local AFGE bargaining units irrespective of whether they are members of the union. All of the plaintiffs in the current action are members of that bargaining unit and, thus, covered by the collective bargaining agreement.

The grievance procedures are set out in Article 36. An employee "grievance" is defined as follows:

> A grievance by a bargaining unit employee(s) is a request for personal relief in any matter of concern or dissatisfaction to the employee or group of employees concerning the interpretation, application and/or violation of this Agreement or the supplement under which the employee(s) is covered, or the interpretation or application of any law, rule or regulation with respect to personnel policies, practices and any other matters affecting conditions of employment.

The parties do not dispute that this language covers Fair Labor Standards Act ("FLSA") claims. The agreement later states that "[a] Union Grievance deals with a broad and general subject rather than an individual case except by mutual agreement of the Parties." Article 36 § 6 also provides that the grievance procedure "is the exclusive procedure available to bargaining unit employees for the resolution of grievances." It allows either party to the grievance, if not satisfied with the decision, to submit the matter to arbitration.

During 1997 and 1998, eleven locals filed substantively identical "union grievances" against DLA for the wrongful denial of FLSA overtime pay.[1] Local 1698 filed its grievance on December 21, 1998. In pertinent part, it stated the following:

1. Nature of Grievance

. . . .

This is a grievance regarding the wrongful failure of [DISC] ... to pay FLSA overtime compensation to bargaining unit members.... Thus, this grievance concerns the misapplication of laws and regulations affecting the pay and working conditions of AFGE Local 1698 bargaining unit members employed by DLA. In addition, the agency's failure to provide employees with the FLSA overtime is in violation of article 21, section 1 of the collective bargaining agreement.

On behalf of current and former AFGE Local 1698 members and pursuant to Article 36 of the collective bargaining agreement covering the parties, AFGE Local 1698 hereby grieves the wrongful failure of the United States Government to provide them with time and one-half overtime compensation in accordance with Section 7 of the FLSA, 29 U.S.C. § 207(a), and Title 5 of the U.S.C.

. . . .

For the past three years and before, and continuing to date, the Agency has violated and continues to violate the provisions of the FLSA and Title 5 by failing and refusing, in a willful and intentional manner, to pay the overtime pay required under law

to employees at grades GS–12 and below who work in the positions occupied by AFGE Local 1698 bargaining unit members.

As all of the DLA members at the GS–09 and above grade level represented by AFGE Local 1698 are currently improperly classified as "exempt" from the FLSA, *each and every* time that these employees have worked overtime during the past three years, the Agency has failed to properly compensate them for that work . . . .

. . . .

In accordance with Article 36, Section 8, the unit employees covered by this grievance hereby designate AFGE Local 1698 to act as their representative in this matter.

II. *Relief Sought:*

AFGE Local 1698 seeks relief to the fullest extent available under the law for the Agency's wrongful failure to pay FLSA overtime pay to bargaining unit employees. In addition, for each bargaining unit member who ultimately expresses an interest in pursuing a damage award, AFGE Local 1698 seeks an award of back wages ... as defined under the FLSA . . . .

Further, in accordance with Section 16(b) of the FLSA, AFGE Local 1698 seeks an equal amount of damages in the form of liquidated damages and reimbursement of attorney fees and expenses incurred in pursuing the employees [sic] rights under the FLSA to make the Union whole again. . . .

Of course, AFGE Local 1698 also seeks to have the FLSA status of each bargaining unit member who is now classified as FLSA exempt to be changed to FLSA non-exempt so that these employees can begin receiving true FLSA overtime as required under the law.

The agency denied all of the locals' grievances, including that of Local 1698. In the fall of 1999, the first grievance, which was substantively identical to Local 1698's, was advanced to arbitration.

---

1. DLA originally disputed arbitrability on the ground that the grievance was not a "union grievance." The arbitrator rejected this argument.

While the grievance was in arbitration, the agency and representatives from the participating unions engaged in settlement negotiations. On July 14, 1999, the two sides executed a settlement agreement covering Local 1698, as well as the ten other locals.

Attached to the settlement agreement were Appendices A, B, and C, which listed the positions for which overtime was claimed in the unions' grievances. It was agreed that the positions listed in Appendix A would remain exempt from the FLSA and that the positions listed in Appendix B would be treated as FLSA non-exempt in the future. The exemption status for positions listed in Appendix C remained in dispute. The two sides agreed to engage in negotiations using a mediator to attempt to resolve the Appendix C positions and to advance the matter to arbitration if the negotiations failed.

The settlement agreement also provided that DLA would pay the eleven AFGE locals $5,285,000, which was calculated as follows:

3. The Employer agrees to pay the Union a total of $5,285,000 on or before October 10, 1999. Of this amount, $225,000 represents reimbursement of attorneys' fees and costs incurred to date by the Union in pursuing the FLSA grievances. (The figure $5,285,000 was calculated by adding $225,000 in attorneys' fees and costs to $5,060,000. The figure $5,060,000 was divided by 3,225, which was the estimated number of bargaining unit employees in the eleven participating locals, though the parties recognize that the lump sum figure of $5,060,000 is to be distributed solely at the discretion of the eleven participating locals among employees of those locals who have chosen to participate in the FLSA grievances.) . . .

Paragraph 7 of the agreement went on to provide:

The $5,285,000 payment represents all backpay, interest, liquidated damages and attorneys' fees and costs for the positions identified in Appendices A, B, and C incurred in the Union grievances up to the date that this Agreement is signed. Each employee who is in one of the Union Locals and who occupies one of the positions identified in Appendix C shall receive a payment of $200.00 on or before October 10, 1999. In exchange for this payment, no backpay, interest or liquidated damages will accrue for employees who occupy the positions identified in Appendix C for FLSA claims for the time period between the date the agreement is signed and nine months thereafter-i.e., up to April 14, 2000.

The amount the union received, in short, was calculated based on back pay for all bargaining unit employees of the eleven locals, including plaintiffs here.

Finally, the settlement agreement provided that, other than the possible arbitration of Appendix C positions, the participating locals would not "arbitrate the matters asserted in the FLSA grievances for the time periods covered by those grievances nor [would] they pursue to arbitration individual employee FLSA claims other than as provided in [the] Agreement, including the FLSA status of positions in Appendices A and B."

In September 1999, DLA transmitted $5,285,000 to the law firm representing the AFGE locals. DLA also paid $200 directly to each employee holding an Appendix C position who was represented by the eleven union locals, including plaintiffs. The negotiations to resolve the disputed Appendix C positions proved unsuccessful. As a result, that matter was taken to arbitration.

On October 12, 1999, while the Appendix C exemption status dispute was still in arbitration, a memorandum was sent to Local 1698 by the law firm that represented the eleven union locals during the earlier settlement negotiations. The memorandum stated that a lawsuit was being filed to recover FLSA overtime compensation for employees at DLA. The memorandum provided that "employees who were previously in the AFGE Local 1698 DLA bargaining unit, but who are now in AFGE Local 62, and who did not previously sign up for the Local 1698 grievance" were eligible to participate in the suit. The memorandum went on to list the forty positions to which the suit was limited. All but one of the positions were included in Appendices B or C to the settlement agreement. The memo required the employee, among other things, to complete a con-

sent/retainer form in order to participate in the lawsuit.

The complaint filed in this case is the culmination of the October 12, 1999, memorandum. There are currently 416 plaintiffs, all of whom either hold or held positions identified in Appendices B or C to the settlement agreement.[2]

During briefing on the issues raised in this court's order of April 26, 2004, the parties settled the arbitration of the Appendix C positions. Most of the positions that were the subject of the dispute were converted to FLSA non-exempt effective April 2004. The agreement also stated that "[n]o additional FLSA back wages will be paid as a result of this Agreement," and that, in the event that there is a dispute over the terms in the agreement, "the parties agree to select an arbitrator to resolve any such disputes."

## DISCUSSION

Defendant argues that the 1999 settlement agreement forecloses the current lawsuit because the union settled on behalf of all bargaining unit members, including those who did not sign a consent form. Plaintiffs respond that the elements of an accord and satisfaction have not been met because none of the named plaintiffs received back pay from the settlement due to their failure to sign a consent form.

After the Federal Circuit decision in *O'Connor*, it is clear that a union representing federal employees may waive the FLSA claims of employees within the bargaining unit. 308 F.3d at 1244. The plaintiffs in *O'Connor* conceded that a settlement agreement similar to the one here met the four requirements of an accord and satisfaction. Consequently, the lower court's prior grant,

in the alternative, of a motion for partial summary judgment was upheld. The settlement was held to bind not only the union, but also the employees in the bargaining unit.

Plaintiffs thus concede, as they must, that the local can compromise the rights of all bargaining unit members. They assert here, however, that it did not in fact do so; they argue that the parties intended that the claims of the individual unit members who did not receive back pay were not to be foreclosed by the settlement.[3] Plaintiffs contend that the language of the settlement agreement here is clear. They argue instead that, if it is found ambiguous, the court should take account of parole evidence which they assert demonstrates that defendant's interpretation of the agreement is incorrect.

There were two types of monetary payment in the settlement. The United States agreed "to pay the Union a total of $5,285,000 on or before October 10, 1999." The "figure $5,285,000 was calculated by adding $225,000 in attorneys' fees and costs to $5,060,000" and the "figure $5,060,000 was divided by 3,225, which was the estimated number of bargaining unit employees in the eleven participating locals." Although the calculus is the reverse of what one would expect, defendant points out that the figure $5,060,000 is nevertheless inextricably linked in the settlement with a number representing all employees, including plaintiffs, irrespective of whether they signed a consent form. Defendant also points to Paragraph 7 of the settlement agreement, where the parties state the following: "The $5,285,000 payment represents all back pay, interest, liquidated damages and attorneys' fees and costs for the positions identified in Appendices A, B, and C incurred in the Union grievances up to the date that this Agreement is signed."

2. Although one Appendix A position was listed in their statement of genuine issues, plaintiffs maintain that no employees occupying Appendix A positions were permitted to participate in the lawsuit. Plaintiffs made the same representation at oral argument.

3. Plaintiffs call the court's attention to the recent decision in *Ahrens v. United States*, 62 Fed.Cl. 664 (2004), which distinguishes *O'Connor*, in part, preserving the claims of some plaintiffs. *Ahrens* is of limited use to plaintiffs here, however. Unlike the settlement agreement in this case,

the memorandum of understanding ("MOU") in *Ahrens* only addressed grievances filed by particular individuals before the memorandum was executed. In other words, the MOU could not be read as binding non-grieving employees. Despite the fact that the local *could have* bound all bargaining unit employees, it did not do so. As to other employees, the court found that the terms of the MOU were in complete satisfaction of all the employees' claims, both past and future.

There is no question that plaintiffs hold or held positions listed in Appendices B and C.

Plaintiffs deem these facts not controlling because the settlement agreement also recognized that "the lump sum figure of $5,060,000 is to be distributed solely at the discretion of the eleven participating locals among employees of those locals who have chosen to participate in the FLSA grievances." Plaintiffs view themselves as free to pursue a claim for back pay because this suit consists only of bargaining unit employees who did not sign forms consenting to participate in the grievance and thus did not receive back pay.

The other type of monetary relief was a $200–per–employee payment made to each "employee who is in one of the Union Locals and who occupies one of the positions identified in Appendix C." In exchange for this payment, "no back pay, interest or liquidated damages will accrue for employees who occupy the positions identified in Appendix C for FLSA claims for the time period between the date the agreement is signed and nine months thereafter—i.e., up to April 14, 2000." Plaintiffs contend that the $200 payment to these employees constituted "front pay" in anticipation of a resolution of the claims then still subject to arbitration. The agreement is not binding on them, according to plaintiffs, because they provided nothing in consideration for this money.

We begin with the undisputed fact that the grievance, as initially filed by the union local, was brought on behalf of all bargaining unit members. Local 1698 sought "relief to the fullest extent available under the law for the Agency's wrongful failure to pay FLSA overtime pay to bargaining unit employees. *In addition*, for each bargaining unit member who ultimately expresses an interest in pursuing a damages award, AFGE Local 1698 seeks an award of back wages ...." (Em-

phasis added). Relief thus was not limited to those who consented in writing. The language of limitation in the grievance on which plaintiff relies—"for each bargaining unit member who ultimately expresses an interest in pursuing a damage award, AFGE Local 1698 seeks an award of back wages"—appears in the request for monetary relief.[4] Other relief sought, however, was not limited to consenting employees: "Local 1698 also seeks to have the FLSA status of each bargaining unit member who is now classified as FLSA exempt to be changed to FLSA nonexempt so that these employees can begin receiving true FLSA overtime."

The settlement agreement reflects this same dichotomy. Some relief was made available irrespective of whether a bargaining unit member signed a consent form. Employees holding positions in Appendix B were no longer exempt; the exemption status of positions listed in Appendix C would be resolved through arbitration (which was subsequently resolved in plaintiffs' favor). Only those employees whose positions were listed in Appendix A remained exempt. Because all plaintiffs in this action fall under either Appendix B or C, they all received some type of relief. Appendix C employees also received $200, irrespective of whether they signed consent forms.[5]

Moreover, as defendant points out, the relevant portion of Paragraph 7 of the settlement agreement is unambiguous: "The $5,285,000 payment represents all back pay, interest, liquidated damages and attorneys' fees and costs for the positions identified in Appendices A, B, and C incurred in the Union grievances up to the date that this Agreement is signed." Plaintiffs' assertion that their claims were not resolved by the settlement agreement is inconsistent with the plain meaning of the paragraph.

---

4. We agree with the decision of the trial court on remand in *O'Connor*. *O'Connor* involved the same settlement agreement at issue here. The court rejected the argument that the agreement was not preclusive of an employee's rights unless it could be shown that the employee received a payment: "The third paragraph of the Settlement Agreement speaks to the rights of the locals to distribute funds to participating employees, not to whether all employees represented by the locals are bound." *O'Conner v. U.S.*, 60 Fed.Cl. 164, 170 (2004).

5. Contrary to plaintiffs' contention, the agency did get something in exchange for the $200 payments—waiver of back pay claims from the time of the settlement through April 14, 2000.

We therefore find no ambiguity in the agreement itself. The waiver binds all members of the bargaining unit, including these plaintiffs. The fact that not all bargaining unit members shared in the $5,060,000 payment does not mean that the settlement fails to constitute a resolution of their claims for back pay.

Even assuming some ambiguity in this agreement, we find that plaintiffs' parole evidence would not dictate a different result. Plaintiffs offer three affidavits. Virginia Hemingway is President of AFGE Local 2433 and one of the union negotiators. She states that "it was the intent and understanding of the Union negotiators that this lump sum payment represented FLSA damages owed to those employees who elected to participate in the Settlement by signing individual consent forms. That limitation and understanding was incorporated in the final settlement language." We note that Ms. Hemingway does not attest that the union negotiators' understanding was expressed to agency negotiators. In addition, the contention that her understanding was captured by the language of the agreement is a legal assertion with which we disagree, as explained above.

John Rios, the former President of Local 2136, states that:

In agreeing to the lump sum settlement, the Union took the following factors into consideration: the estimated number of grievants who expressed an interest in receiving back pay, the average number of overtime hours worked, and the likelihood of winning an award of liquidated damages. At no time during the negotiations did the Agency request the Union's basis for its lump sum figure.

The Agency never asked the Union to seek individual waivers from bargaining unit employees.

We deem Mr. Rios' first assertion immaterial. Whatever factors the union took into account do not impact the interpretation of the agreement; the agreement merges all prior negotiations. Nor is it controlling that the agency did not ask for the basis of the union's figure. The agreement itself spells out in detail how the back pay figure was calculated. That contract language is controlling. Finally, the fact that the agency did not ask for individual waivers does not affect the meaning of the agreement. The union, as the employees' exclusive bargaining unit representative, had the right to negotiate and compromise on behalf of all individuals in the bargaining unit. No additional, particularized waivers were necessary.

The third affidavit is that of Brunsun Edwards. Mr. Edwards was Vice President of Local 62 in 1998 and filed the grievance for his local. He states that he explained to agency representatives that the grievance sought back pay only "on behalf of bargaining unit employees who chose to participate in the grievance by signing a consent form." He conveyed this same information to the employees themselves. Mr. Edwards represented the local during settlement negotiations, during which "it was clear that the Union was seeking pack pay only on behalf of the employees who chose to participate in the grievance by signing the consent/retainer form." He does not explain how he knew what was clear to agency negotiators, but we will assume it was because he had previously explained this to agency personnel. He also told agency personnel, however, that he was seeking more generally, "to have the FLSA status of each FLSA exempt bargaining unit employee changed to FLSA non-exempt." Taken as a whole, Mr. Edward's affidavit does not contradict the plain meaning of the agreement but merely asserts that the union sought some relief on behalf of all employees.

The three affidavits, in sum, do not provide a reason to go beyond the apparent plain meaning of the settlement agreement. The same is true of the other materials plaintiffs offer. The grievance plainly was initiated on behalf of all members of the bargaining unit. The fact that not all relief was sought on behalf of all members does not mean that the settlement of the grievance as a whole did not affect all those members. Similarly, the notices posted by the union merely restate what is recited in the grievance or settlement.

None of the parole evidence contradicts the court's reading of the settlement agree-

ment, namely: all unit employees were covered by the grievance; all unit employees received something from the settlement; not all employees received back pay, but the back pay claims of *all* unit employees were compromised.

We conclude that the elements of an accord and satisfaction were present. There was proper subject matter, the present parties were included and competent, there was a meeting of minds, and there was consideration. *See Brock & Blevins Co. v. United States,* 170 Ct.Cl. 52, 58, 343 F.2d 951, 955 (1965). Plaintiffs' current claim, at least through April 14, 2000, is thus barred.

## CONCLUSION

Defendant's motion for summary judgment is granted in part. All the back pay claims of plaintiffs holding positions listed in Appendix B are foreclosed. With respect to Appendix C positions, we hold that back pay claims are barred at least through April 14, 2000. Whether the 2004 settlement of the arbitration of Appendix C positions is conclusive of all back pay claims after April 14, 2000, has not been addressed by the parties. Accordingly, we limit our grant of summary judgment. Defendant is directed to initiate a motion for summary judgment as to this remaining element of plaintiffs' claims on or before January 21, 2005. Final judgment will be deferred until this remaining issue is resolved.